## COMMONWEALTH *vs.* DANIEL J. PRUNTY.

Barnstable. December 9, 2011. - May 23, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Jury and Jurors. Constitutional Law,* Jury. *Practice, Criminal,* Jury and jurors, Empanelment of jury, Challenge to jurors, Instructions to jury, Capital case. *Evidence,* Prior inconsistent statement.

Discussion of the exercise of peremptory challenges to prospective jurors. [304-307]

At a criminal trial, the judge properly requested an explanation justifying the defendant's peremptory challenge of the only African-American in the venire, given that such a challenge was sufficient to rebut the presumption of a properly used peremptory challenge, regardless of whether it was exercised by the defendant or the Commonwealth [307-309]; further, there was no error in the judge's determination that the defendant's proffered reason for the challenge, i.e., a reference to the juror's occupation as a teacher, was not bona fide. [309-311]

At a criminal trial, the judge did not abuse his discretion in empanelling an African-American juror who had been the subject of a peremptory challenge by the defendant, where the juror's response during voir dire questioning whether racial prejudice would affect his ability to be impartial (i.e., that "he would do his best on it") was not so equivocal as to require the inference that he could not be impartial [311-312]; where the fact that the juror responded during voir dire that he had suffered racism was, in the absence of any evidence that he could not be impartial, an impermissible ground on which to base a peremptory challenge [312-314]; and where, in the absence of evidence of the juror's hostility to questioning concerning racial bias, the mere fact of questioning did not create bias such that a peremptory challenge was permissible on that ground [314-315].

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the judge's limiting instruction on the use of a witness's prior inconsistent statements, where, even assuming the instruction was erroneous, there was overwhelming evidence beyond the witness's testimony of the defendant's guilt. [315-318]

INDICTMENTS found and returned in the Superior Court Department on August 31, 2004.

The cases were tried before *Gary A. Nickerson,* J.

*Charles W. Rankin* for the defendant.

*Thomas G. Shack, III*, Assistant District Attorney (*Genevieve K. Henrique*, Assistant District Attorney, with him) for the Commonwealth.

LENK, J. The defendant, Daniel J. Prunty, was convicted by a Superior Court jury of murder in the first degree on a theory of deliberate premeditation. The defendant was convicted also of assault and battery by means of a dangerous weapon and attempted extortion. The convictions arose from an altercation at the defendant's home on August 7, 2004, during which the defendant fatally shot the victim, Jason Wells. On appeal, the defendant argues that the judge erred both in rejecting his exercise of a peremptory challenge of a member of the venire during jury empanelment and in improperly providing a limiting instruction as to the use of prior inconsistent statements elicited on cross-examination of one of the Commonwealth's key witnesses. We conclude that there is no merit in the defendant's first claim of error. As to the second claimed error, even if it were to be assumed, without deciding, that the limiting instruction should not have been given, this did not give rise to a substantial likelihood of a miscarriage of justice. We thus affirm the convictions, and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdict to a lesser degree of guilt.

1. *Background.* a. *Facts.* Based on the evidence admitted at trial, the jury could have found the following facts. On the evening of August 6, 2004, the defendant held a party at his home in Sandwich where several individuals, including Jason Wells, the victim, were using cocaine. After the party, the defendant noticed that money, watches, and jewelry were missing. He suspected Wells.

The next day, the defendant, Wells, and Richard Ford used cocaine at the defendant's home. At some point, the defendant confronted Wells about the missing items, and an argument ensued. Wells in turn accused Rebecca Pape, a friend of Wells who had also been at the defendant's home the night before. The defendant then telephoned Pape, telling her that he knew that she had taken his "stuff" and he wanted it back. Pape, with Christopher Rose and two other individuals, drove to the defendant's home, where the argument between the defendant and Wells was ongoing.

When Wells went into the dining room and sat down, the defendant proceeded upstairs, retrieved his Ruger .22 caliber rifle, and returned to where Wells was sitting. The defendant pointed the rifle at Wells's head and cocked it, telling him, "If you don't get my stuff by sunrise, you'll never see another sunrise again." Rose intervened, pushing the rifle away and consoling Wells, who had started to cry. Wells admitted his role in taking the defendant's property and went into the kitchen to make telephone calls to retrieve the stolen items. When Wells could not reach anyone, the defendant again pointed the gun at his head. This time, the defendant fired into Wells's head.

Pape, having witnessed the shooting, began "panicking." The defendant told her what their story would be: Wells had shot himself while Pape and the defendant had been in the bathroom. The defendant called the Sandwich police to report an accidental shooting. When officers responded, the defendant told them that someone had "shot himself," and led them into the kitchen where Wells was lying on the floor with a gunshot wound to the forehead. The officers detected a pulse and attempted unsuccessfully to resuscitate Wells; he was pronounced dead on arrival at a Boston area hospital.

Police questioned the defendant at the scene; he denied shooting Wells, saying that he had been talking with Pape in the hallway when the shot was fired. He admitted, however, that he had used the rifle to threaten Wells into giving his property back. He was arrested for assault and battery by means of a dangerous weapon. On August 31, 2004, the grand jury returned the three indictments. He was tried in February, 2006, and found guilty on all charges.

b. *The defendant's peremptory challenge.* When trial commenced on February 7, 2006, both the defendant and the Commonwealth were aware that the issue of race was likely to arise, at least tangentially, at trial.[1] During an interview with the police, the defendant had said, "This nigger came up from Hyannis and ripped me off."[2] Although the defendant denied making this statement, the Commonwealth planned to introduce it at trial. As a result, the judge allowed the defendant's motion for

[1]The defendant is Caucasian and the victim was African-American.
[2]Christopher Rose had also stated, "The nigger shot himself."

individual voir dire of each member of the venire concerning racial prejudice. See *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), overruled in part on another ground, *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990) (in murder cases where defendant and victim are of different races, judge must conduct such voir dire on defendant's request).

The judge decided to empanel sixteen jurors; thus, each side was entitled to sixteen peremptory challenges.[3] The judge began the empanelment process by introducing the parties, describing the nature of the charges, and naming potential witnesses. The prospective jurors, as a group, were asked the general questions prescribed by G. L. c. 234, § 28, and Mass. R. Crim. P. 20 (b) (1), 378 Mass. 889 (1979). Many responded in the affirmative, and the judge proceeded to an individual voir dire of each member of the venire. At the conclusion of each individual voir dire, both the prosecutor and the defendant were required to exercise any desired peremptory challenge.[4] In the course of this process, eleven jurors were excused for cause, the defendant exercised fourteen peremptory challenges, and the Commonwealth exercised ten peremptory challenges.

Prior to the challenged empanelment of Juror no. 16, the judge had seated fifteen jurors. Juror no. 16, the first African-American member of the venire to be individually questioned,[5]

---

[3]The number of peremptory challenges permitted in criminal trials is set forth in Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979).

[4]This procedure is in contrast to allowing the parties to exercise peremptory challenges after a full potential jury has been selected. The practice used here is permitted in capital trials. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 291-292, cert. denied, 493 U.S. 940 (1989).

[5]The record on appeal is missing precise information concerning the racial composition of the jury. However, in light of the clarity of the basis of the Commonwealth's objection and the agreement among the judge, prosecutor, and defense counsel that Juror no. 16 was the first and only African-American member of the venire to be questioned, a point undisputed on appeal, we assume for present purposes that this was the case. Contrast *Commonwealth* v. *Smith*, 450 Mass. 395, 405, 406, cert. denied, 555 U.S. 893 (2008), citing *Commonwealth* v. *Soares*, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979) (*Soares*) (declining to analyze defendant's claim of error because "the record [did] not supply the necessary factual foundation" where defense counsel and prosecutor focused on different aspects of juror's identity during discussion of challenge, defense did not make explicit objection to Commonwealth's challenge, and parties provided "no information" concerning juror's identity).

was asked the same question as had been asked, in nearly identical form, of each prospective juror:

> "In this matter, sir, the [d]efendant is white; the deceased was black; the witnesses may be of different races or ethnic heritage. Does this information about race and ethnic heritage affect your ability to be fair and impartial as a juror?"[6]

Like every juror seated to that point, Juror no. 16 responded "no" to this question. After the judge declared Juror no. 16 indifferent, the defendant exercised a peremptory challenge, but the Commonwealth objected. The prosecutor stated, "he's the only African-American potential juror that we've had in this panel, and on that basis, I'm objecting."

In response, the judge ruled that the Commonwealth had "met the requirements of a prima facie showing of impropriety" on the basis that he could recall no other prospective juror with a similar physical appearance and, having reviewed the juror's questionnaire, concluded that "there is no reason for challenge that is immediately apparent." The judge then asked the challenging party, the defendant, whether there was a "clear and reasonably specific explanation" for exercising the challenge.

Defense counsel then provided the following rationale for the challenge[7]:

> "[T]his gentleman is a — is a school teacher with young children. Some of the people who are going to testify in this case were a relatively young age. They were in their early 20's. They were associated with drugs. They — it appears that one of them at least and perhaps a couple of them, actually three of them — I think the victim, Mr. Rose and Miss Pape had somewhat of a troubled history

---

[6]Defense counsel did not request that the judge pose additional questions to the venire concerning the possible effect of racist remarks purportedly made by the defendant and Rose on the potential jurors' ability to be fair and impartial.

[7]Before providing this justification, defense counsel argued that the Commonwealth had failed to make its prima facie case because one of the seated jurors was "of color," described by counsel as "light Hispanic." The judge replied, "I don't see how one could suggest even remotely that the gentleman is in any way similar to the situation before the [c]ourt now."

that's reflected during their course of telephone conversations that were recorded. That history affects how far they went in school and what they did in school. I'm informed that some of the towns down at the Cape — I don't know in particular Barnstable public schools, but certainly I'm told the Sandwich public schools, Hyannis public schools have unfortunately been impacted rather heavily — most recently the Sandwich public schools by alcohol and drug abuse. I feel like this particular type of juror would not be able to sit impartially on a case like this. As a result of his occupation, I also bring to the [c]ourt's attention that he doesn't bring a lot of diverse experience with him in terms of who his spouse is. It appears she is an administrator, also with the Barnstable public schools. I interpret that to be perhaps a principal or a vice-principal. Typically they promote or advance to that position from a teaching position. So, they have a very, very similar background in that regard. And I feel that he would not sit fairly in judgment of my client on a case like this."

In response, the judge pointed out that two seated jurors were retired teachers, and three other jurors had minor children.[8] In view of the circumstances, the judge found "that the proffered reason for a challenge is not bona fide, but rather is a mere sham."

Defense counsel then offered a second reason for the challenge. He argued that certain evidence at trial would establish that the defendant "is a racist," as demonstrated by his use of the word "nigger" on multiple occasions and his references to African-Americans as "moon pies" and "porch monkey[s]."[9] According to defense counsel, "comments like that certainly are going to perhaps get under the skin of somebody who might be a little bit more sensitive to that issue, particularly where that is their descent." The judge decided to bring Juror no. 16 back for

[8]The judge correctly sought a response from the Commonwealth to the defendant's race-neutral explanation. See *Commonwealth* v. *Calderon*, 431 Mass. 21, 26 (2000). The prosecutor simply repeated his basis for the objection.

[9]None of the trial testimony attributed such statements to the defendant. No reference to "moon pies" or "porch monkeys" appears in the transcript, and the statement, "The nigger shot himself," was attributed to Christopher Rose. The one racist statement attributed to the defendant was, "This nigger came up from Hyannis and ripped me off."

additional voir dire on this issue. The following exchange between the judge and Juror no. 16 ensued:

> THE JUDGE: "If someone in the course of the evidence is accused of making racist statements, would that in any way cloud your ability to sort out issues of credibility? Who is telling the truth, who isn't? And then acting on the evidence as you find it to be?"
>
> JUROR No. 16: "Wow."
>
> THE JUDGE: "Yeah, wow."
>
> JUROR No. 16: "I mean, as a teacher, I've been able to, you know, separate things anyway. So I think I would be able to do that."

Unsatisfied with the judge's question, defense counsel stated, after the juror had been dismissed from the court room, that "I would much rather have the [c]ourt . . . let the prospective juror know that these remarks are going to be attributed to my client rather than other witnesses." The judge determined there was no need for additional voir dire, stating, "[Y]ou saw the gentleman's reaction, just as I did now. And I must say, I — from my own eyes, I can't imagine a more straightforward, honest response from a man." Nevertheless, the judge ordered the juror returned to the court room for additional questioning, as follows:

> THE JUDGE: "When you came in a few moments ago, I spoke about how there may be some testimony from witnesses that could be taken as racist comments. I want to be more direct in this regard. In this case, there will be comments attributed to the [d]efendant by other witnesses that he says things to the effect that, 'That nigger was going to die anyway' or — the exact language, gentlemen?"
>
> THE PROSECUTOR: "I think one of the comments attributed is that, 'The nigger shot himself.' "
>
> THE JUDGE: " 'That the nigger shot himself.' There may also be comments attributed to the [d]efendant referencing black people as 'porch monkeys' or —"

DEFENSE COUNSEL: "I believe the expression that will be used is moon pies."

THE JUDGE: "Moon pie. Now, to these various comments, the [d]efendant has disavowed them, has denied them. But still, that type of evidence is apt to come in. And I want to be as sensitive as I can to your concerns and to everyone's concern for a fair trial. Would you be able to set aside the shock value, if you will, or the shock [e]ffect of such racist statements —"

JUROR No. 16: "Uh huh."

THE JUDGE: "— and proceed to judge this case strictly on its merits and the credibility of the evidence as you determine it to be?"

JUROR No. 16: "I mean, I've been called quite a few of those in my lifetime anyway. So —"

THE JUDGE: "And can you go forward and be a fair and impartial juror under the circumstances that I have outlined?"

JUROR No. 16: "I would be able to do my best on it."

On the basis of these responses, the judge issued his final ruling: "The [c]ourt finds there to be no cause for challenge of this juror. The [c]ourt finds this juror to be fair and impartial. The [c]ourt finds that the challenge is mere sham. For all of those reasons, the gentleman will be seated as Juror 16." Over defense counsel's objection, Juror No. 16 was seated and sworn. Juror No. 16 was later selected as one of the twelve jurors to deliberate on the verdict and was made the foreperson of the jury prior to deliberations.

c. *Admission of prior inconsistent statements and judge's limiting instruction.* The defense, arguing that Wells had either shot himself or been shot by Christopher Rose, hinged largely on prior inconsistent statements of the individuals who were at the house at the time of the shooting. In this regard, Pape, as one of only two individuals who testified that she had actually seen the defendant shoot Wells, was the Commonwealth's primary witness. During cross-examination, defense counsel called

the jury's attention to certain inconsistent statements Pape had made concerning the shooting during her grand jury testimony on August 31, 2004:

> DEFENSE COUNSEL: "And on that day, right, we're only twenty-four days after the murder, you again say, 'He came into the bathroom a few times. And I recall at one point hearing a gunshot.' 'Where were you when that gunshot was fired?' 'I was in the bathroom.' 'Where was [the defendant], if you know?' 'I recall [the defendant] being in the bathroom with me when that gun was fired.' Do you recall testifying to that before a [g]rand [j]ury?"

> THE WITNESS: "Yes."

Pape testified at trial that her statements before the grand jury had been perjury. In addition to Pape's grand jury testimony, the jury heard about a number of her other prior inconsistent statements, all to the same effect, during cross-examination.[10] Each of these statements was admitted without objection from the Commonwealth and without a request that their purpose be limited solely to the jury's assessment of Pape's credibility.

In his final instructions to the jury, however, the judge limited the jury's use of any prior inconsistent statements as going only to a witness's credibility:

> "What you can't do is you cannot substitute that prior

---

[10]Rebecca Pape admitted to having told police on the day of the shooting that she was with the defendant in the bathroom when the gunshot went off. She testified also that she told her boy friend at the time that she had "watched [the victim] blow his brains out of his head"; "he killed himself"; the defendant "was in the bathroom with [her]" at the time of the shooting; and her testimony before the grand jury was the "truth." Pape discussed with her boy friend the possibility that pending charges against both of them would be "dropped" in exchange for her testimony against the defendant. In a separate conversation with her mother, Pape said that the defendant had not committed the murder. In a conversation with the defendant while he was in prison, she stated, "There is no way that you could have killed anybody," because "you were in my sight in the bathroom when the gun went off." A number of Pape's other prior inconsistent statements, all substantially identical, were admitted through her cross-examination testimony. Pape testified that these statements, like her grand jury testimony, had been a "lie." In addition, certain of these inconsistent statements, similarly identical in substance, were admitted through the testimony of the defendant's witnesses.

inconsistent statement for the truth of what the witness has said on the stand, unless, of course, the witness adopts the prior inconsistent statement as their present testimony. The inconsistent statement in the past is used only to judge credibility of the witness."

This instruction was given without objection from either side.

2. *Discussion.* a. *Peremptory challenge of Juror No. 16.* The defendant claims that the judge erred in refusing to allow his exercise of a peremptory challenge of Juror No. 16.[11] We conclude that, in all respects, the empanelment of Juror No. 16 was proper.

(i) *Standard of review.* "We grant deference to a judge's ruling on whether a permissible ground for the peremptory challenge has been shown and will not disturb it so long as it is supported by the record." *Commonwealth* v. *Rodriguez,* 431 Mass. 804, 811 (2000). We will not conclude that a judge has abused this considerable discretion "unless juror prejudice is manifest." *Commonwealth* v. *Seabrooks,* 433 Mass. 439, 443 (2001).

(ii) *Analysis.* Both art. 12 of the Massachusetts Declaration of Rights[12] and the Sixth Amendment to the United States Constitution afford a criminal defendant the right to a trial by an impartial jury. See *Commonwealth* v. *Vann Long,* 419 Mass. 798, 802 (1995), and cases cited. The presence of even one biased deliberating juror is sufficient to deprive a defendant of this right and require a new trial. See *Commonwealth* v. *Hampton,* 457 Mass. 152, 164 (2010).

Peremptory challenges are "[o]ne of a party's limited number of challenges that do not need to be supported by a reason . . . ." Black's Law Dictionary 261 (9th ed. 2009). See *Commonwealth*

---

[11]Specifically, the defendant claims that the judge erred in requiring defense counsel to give an explanation for his peremptory challenge of Juror No. 16; rejecting defense counsel's justification for the challenge; refusing to exclude the juror "for cause" after his responses to additional voir dire; and not allowing the defendant's peremptory challenge after the juror's disclosure of his personal experiences and equivocal responses as to whether he could be fair.

[12]Article 12 of the Massachusetts Declaration of Rights provides, in relevant part: "And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."

v. *Mitchell*, 367 Mass. 419, 420 (1975), quoting *Swain* v. *Alabama*, 380 U.S. 202, 220 (1965) (*Swain*) ("exercised without a reason stated, without inquiry and without being subject to the court's control"). This type of challenge is distinct from a party's unlimited ability to challenge jurors "for cause," that is, challenges "supported by a specified reason, such as bias or prejudice, that would disqualify that potential juror." Black's Law Dictionary, *supra* at 261. The scope of the peremptory challenge exceeds that of the "for cause" challenge to permit a party to "eliminate those jurors perceived as harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge." *Commonwealth* v. *Soares*, 377 Mass. 461, 483-484, cert. denied, 444 U.S. 881 (1979) (*Soares*).

The right to use peremptory challenges, however, is not absolute. The exclusion of prospective jurors solely by virtue of their membership in a "particular, defined grouping[] in the community"[13] is prohibited by both art. 12, *Soares*, *supra* at 486-488, and the equal protection clause of the Fourteenth Amendment to the United States Constitution. See *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994); *Batson* v. *Kentucky*, 476 U.S. 79, 97 (1986) (*Batson*).[14] This limitation is consistent with our earlier jurisprudence that "[a] fair jury is one that represents a cross section of community concepts." *Commonwealth* v. *Ricard*, 355 Mass. 509, 512 (1969). The cross section requirement ensures a "diffused impartiality" and a "sharing in the administration of justice [as] a phase of civic

[13]The *Soares* court viewed the group affiliations listed in art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Constitution — "sex, race, color, creed, or national origin" — as those that may not form the basis of juror exclusion. See *Soares*, *supra* at 488-489 n.33. While we have since expanded the scope of this protection, for present purposes the limitation detailed in *Soares*, rendering challenges based on race impermissible, is sufficient.

[14]"*Batson* [v. *Kentucky*, 476 U.S. 79 (1986) (*Batson*),] adds nothing new to the law already established in this Commonwealth. The analysis in *Batson*, *supra*, is similar to the analysis in *Soares*, *supra*, albeit on different constitutional grounds." *Commonwealth* v. *Young*, 401 Mass. 390, 402 n.11 (1987), overruled on another ground, *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990). Accordingly, "our analysis of this issue is the same under the Federal Constitution and the Declaration of Rights." *Commonwealth* v. *Vann Long*, 419 Mass. 798, 806 (1995).

responsibility." *Taylor* v. *Louisiana*, 419 U.S. 522, 530-531 (1975), quoting *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting). To allow such invidious discrimination in jury selection would undermine "public confidence in the fairness of the criminal justice system." *Soares, supra* at 480.

We presume that peremptory challenges are properly made, but this presumption can be rebutted by a prima facie showing of either a pattern of challenges of members of the same discrete group, *Soares, supra* at 473-474 n.8, or, in certain circumstances, challenge of a single prospective juror within a protected class, *Commonwealth* v. *Harris*, 409 Mass. 461, 465 (1991) (*Harris*), where "there is a likelihood that [a prospective juror is] being excluded from the jury solely on the basis of . . . group membership." *Commonwealth* v. *Burnett*, 418 Mass. 769, 770 (1994).[15] If the judge finds that a prima facie case of impropriety has been made, the burden shifts to the challenging party, who "must provide, if possible, a neutral explanation establishing that the challenge is unrelated to the prospective juror's group affiliation." *Harris, supra* at 464. In assessing proffered rationales for a juror's exclusion, "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such [challenges] from sham excuses belatedly contrived to avoid admitting facts of group discrimination."[16] *Soares, supra* at 491, quoting *People* v. *Wheeler*, 22 Cal. 3d 258, 282 (1978). See *Felkner* v. *Jackson*, 131 S. Ct. 1305, 1307 (2011), quoting *Sny-*

---

[15]To prove discriminatory intent, *Batson* and *Soares* required a prima facie showing of a "pattern" of such impermissible challenges, but we have since dispensed with the strict "pattern" requirement, holding that "the challenge of a single prospective juror within a protected class could, in some circumstances, constitute a prima facie case of impropriety." *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 273, cert. denied, 522 U.S. 1033 (1997). In *Commonwealth* v. *Harris*, 409 Mass. 461, 465 (1991) (*Harris*), we held that where the challenged juror is the only member of his or her protected class in the entire venire, that "pattern" is sufficient to rebut the presumption of a properly used peremptory challenge. "This is so because the ultimate issue is not whether there is a 'pattern' of excluding a discrete group, but whether the challenge made to any member of the panel is impermissibly based on the juror's membership in one of the discrete groups protected under [*Soares*]." *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463 n.3 (2003).

[16]As was done here, "[i]n making this determination, the judge should hear from the opposing party as well." *Id.* at 464 n.6.

der v. *Louisiana*, 552 U.S. 472, 477 (2008) (trial court determination merits "great deference" and "must be sustained unless it is clearly erroneous").

In this case, the judge properly requested an explanation for the defendant's peremptory challenge of the only African-American in the venire. "Where a venire contains 'a paucity of African-Americans' a judge 'has broad discretion to require an explanation without having to make the determination that a pattern of improper exclusion exists.' "[17] *Commonwealth* v. *Van Winkle*, 443 Mass. 230, 236 (2005), quoting *Commonwealth* v. *Garrey*, 436 Mass. 422, 429 (2002). Under the *Harris* exception to the pattern requirement, even a single racially motivated challenge is constitutionally impermissible, *Harris, supra* at 465, and the judge's request for an explanation was permissible.

The defendant argues that we should hold that "the *Harris* exception does not apply to a peremptory challenge exercised by a defendant," because such a rule "is inconsistent with the special constitutional protections afforded criminal defendants."[18] There is no merit in the defendant's contention.

*Soares* teaches that "we deem the Commonwealth equally to

---

[17]It is therefore inconsequential that, even assuming defense counsel's contention during empanelment was correct, one empanelled juror was of Hispanic descent. The test in *Soares* and *Batson* does not apply to challenges to members of all minority ethnic or racial groups lumped together, but instead applies to challenges to "particular, defined groupings in the community," *Soares, supra* at 486, such as all African-Americans, see, e.g., *id.*, or all Hispanics, see, e.g., *Commonwealth* v. *Vann Long, supra* at 807 n.9. The defendant could not prove that he had not discriminated against the former by allowing a member of the latter group to be seated. See *Gray* v. *Brady*, 592 F.3d 296, 305-306 (1st Cir.), cert. denied, 130 S. Ct. 3478 (2010), and cases cited (rejecting defendant's argument that court should construe African-American and Hispanic jurors as part of the same "cognizable group" for *Batson* purposes because "we cannot assume that 'minorities' constitute the 'cognizable group' essential to showing that the prosecutor intentionally discriminated against such a group in his or her use of peremptory challenges").

[18]The same could be said of *any* limitation on the right to use peremptory challenges. The defendant offers no reason why these concerns apply with particular force to challenges to a single juror based on race or ethnicity. These concerns exist regardless whether a pattern of discriminatory strikes or a single such strike is alleged. We have invalidated the use of discriminatory strikes in either case, to achieve "a balance between the goal of diffused impartiality in the . . . jury and the limitations inherent in a feasible and fair process of jury selection." *Soares, supra* at 485. See Ogletree, Just Say No!: A Proposal to Eliminate Racially Discriminatory Uses of Peremptory Chal-

be entitled to a representative jury, unimpaired by improper exercise of peremptory challenges by the defense." *Soares, supra* at 480-490 n.35. See *Commonwealth* v. *Little,* 384 Mass. 262, 265 (1981), rev'd on other grounds, *Commonwealth* v. *Santos,* 402 Mass. 775, 788 (1988) (*"Soares* principle applies to a defendant as well as the Commonwealth"). Similarly, the United States Supreme Court, recognizing that the harm of discriminatory jury selection "touch[es] the entire community," and not just criminal defendants, has held that the Constitution prohibits not only the State's, but also the defendant's purposeful racial discrimination in the use of peremptory challenges. See *Georgia* v. *McCollum,* 505 U.S. 42, 49 (1992), quoting *Batson, supra* at 87. The objectives served by eliminating discrimination in the use of peremptory challenges — the assurance of "diffused impartiality" in the jury and "public confidence in the fairness of the criminal justice system," *Soares, supra* at 480 — are no less pressing where the discriminatory challenge is exercised by the defendant rather than by the Commonwealth. Ensuring nondiscriminatory use of peremptory challenges is "intended to benefit both sides in a criminal trial, and to protect the right of each person to have the opportunity to serve on a jury without fear of exclusion due to invidious [race]-based discrimination." *Commonwealth* v. *Fruchtman,* 418 Mass. 8, 17, cert. denied, 513 U.S. 951 (1994). See *J.E.B.* v. *Alabama ex rel. T.B., supra* at 128; *Georgia* v. *McCollum, supra.*[19]

We therefore decline to permit defendants a "pattern of one" discriminatory peremptory challenge and continue to adhere to our well-settled precedent that a challenge to the only African-American member of a venire is sufficient to rebut the presump-

lenges, 31 Am. Crim. L. Rev. 1099, 1104 (1994) ("Striking jurors on the basis of race or gender is not always an irrational act; it can sometimes be . . . in keeping with the litigant's goals, and would simply be part of effective advocacy were it not entirely repugnant to the values and standards of the Constitution, values that should and do override the litigant's interest in winning").

[19]The rule conferring the right to peremptory challenges in criminal trials in Massachusetts, Mass. R. Crim. P. 20 (c), 378 Mass. 889 (1979), does not distinguish between the Commonwealth's right to peremptory challenges and the defendant's right. The rule specifically provides that "the Commonwealth shall be entitled to as many peremptory challenges as equal the whole number to which all the defendants in the case are entitled," indicating the equivalence of the interest on each side.

tion of a properly used peremptory challenge, regardless of the party by whom it is exercised. See *Commonwealth* v. *Curtiss*, 424 Mass. 78, 79-80 (1997) (applying *Harris* exception to defendant's exercise of peremptory challenge).[20]

The defendant next asserts that the judge should have accepted his race-neutral reason for challenging Juror no. 16. "The determination whether an explanation is 'bona fide' entails a critical evaluation of both the soundness of the proffered explanation and whether the explanation (no matter how 'sound' it might appear) is the actual motivating force behind the challenging party's decision." *Commonwealth* v. *Maldonado*, 439 Mass. 460, 464 (2003). In this regard, an explanation for a challenge must be both "adequate" (i.e., " 'clear and reasonably specific,' 'personal to the juror and not based on the juror's group affiliation' ") and "genuine" (i.e., "in fact the reason for the exercise of the challenge"). *Id.* at 464, 465.

Here, defense counsel's stated reason for the challenge referred to Juror no. 16's occupation as a teacher. He argued that the problems of drugs in schools might make Juror no. 16 unable to be impartial in a case involving a number of young people involved in drugs. This bias, defense counsel alleged, was compounded by the similar occupation of the potential juror's spouse as a school administrator. "Although defense counsel stated that his peremptory challenge was motivated by nonracial considerations, the judge was entitled to disbelieve him." *Commonwealth* v. *Curtiss, supra* at 82. The judge did just that, holding that "the proffered reason for a challenge is not bona fide, but rather

---

[20]The defendant notes correctly that the exception set out in *Harris* was first applied to an exercise of a peremptory challenge by the Commonwealth where the defendant and the challenged juror were of the same race. See *Harris, supra* at 465. The initial application of the rule, however, does not mean that it must be restricted to that factual context. Indeed, since *Harris*, we have applied the exception to a defendant's use of a peremptory challenge. See *Commonwealth* v. *Curtiss*, 424 Mass. 78, 79-80 (1997). Also, even before *Harris*, we recognized that "common group membership of a defendant and those jurors excluded is not a prerequisite to assertion of the right (to a representative jury)." *Soares, supra* at 490. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 429 n.2 (2002) (applying *Harris* exception even though "the defendant, the victim, and the witnesses were Caucasian" and the challenged juror was African-American).

is a mere sham."[21] In light of the considerable support for the judge's determination apparent from the record,[22] see *Com-*

---

[21]In so stating, the judge used precisely the "key words" ("bona fide" and "sham") that "aid us in our review," *Commonwealth* v. *Curtiss, supra* at 82 n.4, making it clear that he gave "meaningful consideration" to the defendant's proffered rationale. *Commonwealth* v. *Garrey, supra* at 430. The judge concluded that "the explanation was inadequate," *Commonwealth* v. *Rodriguez,* 431 Mass. 804, 810 (2000), and "merely a post hoc justification for an impermissibly motivated challenge." *Commonwealth* v. *Maldonado, supra* at 466. Because the judge made clear findings as to both adequacy and genuineness, his determination is entitled to deference.

[22]The connection between Juror no. 16's occupation and his purported bias, as described by defense counsel, is tenuous at best. While we have held that a juror's occupation may be a sufficient basis for the exercise of a peremptory challenge, see, e.g., *Commonwealth* v. *Garrey, supra* at 429, "where a question has been validly raised about the propriety of a party's use of a peremptory challenge, the claim of occupation as legitimate disqualifier should be carefully scrutinized." *Commonwealth* v. *Benoit,* 452 Mass. 212, 224 (2008). At times, the Massachusetts appellate courts have held to be error a judge's determination that a juror's occupation was sufficient to justify an allegedly discriminatory peremptory challenge. See, e.g., *Commonwealth* v. *Burnett,* 36 Mass. App. Ct. 1, 5, *S.C.,* 418 Mass. 769 (1994). In that case, the Commonwealth had justified its challenge by reference to the African-American juror's position as "a youth services program director," arguing that youth workers have "certain feelings . . . about youth and crime." The Appeals Court concluded that "[t]he record is destitute of any legal or factual basis supporting whatever may have been the prosecutor's belief regarding the unexplained propensities of those who work with youth; nor was any authority offered for the propriety of taking judicial notice of any such occupational attitudes." *Id.*

The same could be said here. None of Juror no. 16's answers during voir dire suggested that his occupation would affect his ability to be impartial. See *Commonwealth* v. *Benoit, supra* at 224-225 (rejecting prosecutor's rationale for challenge premised on juror's occupation [teacher's assistant] where juror "gave no answers to the questions posed to her that would suggest her occupation" would affect her service on jury). Additionally, the judge pointed out that other jurors with the same occupation had not been challenged; defense counsel offered no reason to differentiate this teacher (Juror no. 16) from those teachers previously seated. See *Commonwealth* v. *Maldonado, supra* at 467 ("genuineness [of proffered rationale for challenge was] significantly impaired by the absence of consistency in its application to other jurors"). See also *United States* v. *Thompson,* 528 F.3d 110, 116-117 (2d Cir. 2008) (finding judge properly evaluated and found discriminatory intent in peremptory challenge partly on basis that there was little difference, other than race, between challenged juror and juror already seated).

That defense counsel subsequently provided an additional reason for the challenge (his client's alleged racism) also raises doubts about the genuineness of the first rationale. See *Commonwealth* v. *Rodriguez,* 457 Mass. 461,

monwealth v. *Fruchtman, supra* at 15, quoting *Commonwealth* v. *DiMatteo*, 12 Mass. App. Ct. 547, 552 (1981) ("we do not substitute our judgment for [the judge's] if there is support for it on the record"), we conclude that the judge sufficiently discharged his responsibility to "consider[] both the adequacy and the genuineness" of the defendant's justification for his challenge. *Commonwealth* v. *Maldonado, supra* at 465.

The defendant argues also that the judge erred in not allowing his challenge after the additional voir dire. During this later voir dire process, Juror no. 16 stated that he had "been called quite a few of those [terms that the defendant allegedly used to describe African-Americans] in my lifetime anyway," and, when asked if he could be impartial despite this experience, said, "I would be able to do my best on it." The defendant argues that although such statements "may have been related, in an indirect sense, to his race," they were sufficiently "personal" to Juror no. 16 to justify a peremptory challenge. While the statements may have been personal to the juror, we do not agree that they support the defendant's peremptory challenge.[23]

Of course, prospective jurors may be questioned about race-related bias, as the judge did of every member of the venire in this case, and a defendant may challenge them if "the defendant has specific reason to believe [they] would be incapable of confronting and suppressing their racism." *Georgia* v. *McCollum, supra* at 58. See *United States* v. *Steele*, 298 F.3d 906, 914 (9th Cir.), cert. denied, 537 U.S. 1096 (2002) (prosecutor could legitimately challenge juror who believed race discrimination tainted criminal justice system). When initially questioned as to

473 (2010) (assessing race-neutral rationale for challenge and noting that challenging party "did not change his position" during discussion of challenge as a reason to regard it as adequate). The defendant's appellate counsel conceded at oral argument that, provided only with the justifications originally put forward, he would be "hard pressed" to, and "couldn't successfully," convince us that the judge had abused his discretion. We defer to the judge's well-reasoned decision, which has ample support in both the record and our precedent.

[23]To the extent the defendant argues that, after the additional voir dire, the juror should have been excused "for cause," we disagree. By definition, if (as we conclude) the defendant cannot justify his peremptory challenge, he cannot meet the standard to support a "for cause" challenge. See *Batson, supra* at 97 (justifying "for cause" challenge is higher burden, as reason for peremptory challenge "need not rise to the level justifying exercise of a challenge for cause").

whether racial prejudice would affect his ability to be impartial, Juror no. 16 answered, "No." After additional voir dire, Juror no. 16 stated, "I would be able to do my best on it." This response was not so equivocal as to require the inference that he could not be impartial. The defendant cites *Commonwealth v. Vann Long*, 419 Mass. 798, 804 (1995), for the requirement that Juror no. 16 should have "unequivocally" stated his ability to be impartial. In that case, however, prior to being asked whether he could be unbiased, the challenged juror had already demonstrated that he "harbored a potential ethnic bias against the defendant." *Id.* at 803. Here, no such bias was apparent, so an unequivocal response was not necessary to rehabilitate the juror's impartiality.

Where a juror provides an answer such as Juror no. 16 did here, we conclude that the question of bias is best left to the considerable discretion of the judge, who can observe the juror's appearance during questioning. That is particularly appropriate in this case, as the judge expressly based his opinion, in part, on his assessment of Juror no. 16's appearance — "you saw the gentleman's reaction, just as I did now. And I must say, I — from my own eyes, I can't imagine a more straightforward, honest response from a man." The judge also had the benefit of Juror no. 16's unequivocal response ("No") to the initial question concerning racial bias that was asked of every other juror.[24] We conclude that Juror no. 16's response to additional voir dire questioning was not so equivocal as to require reversal of the judge's determination of his impartiality.

Beyond Juror no. 16's purported equivocation, the defendant claims also that Juror no. 16's experience of racism provides sufficient basis for his peremptory challenge. The United States Supreme Court "firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror." *Georgia v. Mc-Collum, supra* at 59. In recognizing that parties may use peremptory challenges based on criteria that will result in the

---

[24]In response to the question concerning potential racial bias, two other unchallenged jurors gave responses that could be construed equally as equivocal. When asked whether race would affect their ability to be impartial, one juror stated, "No, I don't think so," and the other juror said, "I wouldn't think so." The absence of a challenge in those instances undercuts the defendant's argument.

"disproportionate removal of prospective [minority] jurors," *Hernandez* v. *New York*, 500 U.S. 352, 361 (1991) (plurality opinion) (*Hernandez*), the Court held that if a party provides a reason that has such a disproportionate impact, "the trial judge may consider that fact as evidence that the [party's] stated reason constitutes a pretext for racial discrimination." *Id.* at 363. The Court explained, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal," *id.* at 364, because the party's intent "largely will turn on evaluation of credibility." *Id.* at 365, quoting *Batson, supra* at 98 n.21.

In this case, defense counsel based his challenge on an assumption that an individual who had suffered racism would feel subtle biases against an alleged racist. This assumption, however, is undoubtedly "based" on race, and therefore provides an illegitimate basis for a peremptory challenge. See *Georgia* v. *McCollum, supra* at 59. It would require a measure of "willful intellectual blindness," *Love* v. *Yates*, 586 F. Supp. 2d 1155, 1180 (N.D. Cal. 2008), for us to conclude that Juror no. 16's experience of racism (particularly the race-specific examples described by the judge in his questioning) does not correlate almost perfectly with his race and therefore serve as a "surrogate for race." *Hernandez, supra* at 371. See *id.* at 379 (Stevens, J., dissenting) ("An explanation that is 'race neutral' on its face is nonetheless unacceptable if it is merely a proxy for a discriminatory practice").[25] An assumption premised solely on an individual having suffered racism is an assumption based on race. We will not require the exclusion of all jurors who have suffered racism by assuming their bias in cases where the defendant is alleged to have used racially offensive language. Cf. *Commonwealth* v. *LeClair*, 429 Mass. 313, 323 (1999). Accordingly, we defer to the judge, and conclude that the fact that Juror no. 16 had himself suffered racism, without any evidence

---

[25]We note that while the judge, on request, conducted an individual voir dire of Juror no. 16 as to racial prejudice, there was no request for the judge to question any other potential jurors on the effect that the defendant's alleged racism might have on their ability to be impartial. Just as no other member of the venire was African-American, no other member of the venire was subjected to the same line of questioning as was Juror no. 16.

that he could not be impartial, was an impermissible ground on which to base a peremptory challenge.

Finally, the defendant argues that, even if he was not entitled to challenge Juror no. 16 at the outset, "the in-depth questioning of voir [dire] . . . itself had alienated the juror," and thereby entitled the defendant to exercise the peremptory challenge. The defendant cites *Lewis* v. *United States*, 146 U.S. 370, 376 (1892), quoting 4 W. Blackstone, Commentaries 353, for the proposition that

> "[b]ecause, upon challenges for cause shown, if the reason assigned proves insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside."

Other than the fact that the colloquy took place, there is no evidence from which one could conclude that the procedure had irretrievably biased Juror no. 16 against the defendant. Juror no. 16 expressed no hostility toward either side; the judge found at the conclusion of the colloquy that there was "no cause for challenge of this juror." Furthermore, the defendant himself sought the additional voir dire, a request that the judge allowed in his discretion.

When requesting individual voir dire based on alleged racial prejudice, a defendant runs the risk that "such specific questions may activate latent racial bias in certain prospective jurors or may insult others without uncovering evidence of bias in hard-core bigots who refuse to acknowledge their prejudice." *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990), quoting *Commonwealth* v. *Lumley*, 367 Mass. 213, 217 (1975).[26] However, the opposite choice is not without risk: "not only does a decision *to* request a voir dire present a potential of harm to the defendant, but also a decision *not* to request a voir

---

[26]In *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555-557 (1990), we dispensed with the requirement that a judge conduct a personal colloquy with the defendant when his counsel requests an individual voir dire related to racial prejudice. We reasoned that, because there is an inherent risk of juror bias regardless of the defendant's choice, "[t]he benefit to be obtained by a colloquy does not justify the risk of harm." *Id.* at 557.

dire runs a risk that the jury will include bigots." *Commonwealth v. Ramirez*, at 556. Defendants are the only ones who can make this choice for themselves, and we will not place our collective thumb on the scale. Were we to conclude that the process itself, even where it did not result in any grounds for a permissible peremptory challenge, could bias the juror against a defendant, defendants would always prevail in such challenges; here, either Juror no. 16's answers to additional questioning would reveal his bias, or the additional questioning itself would create that bias. Therefore, we conclude that, at least where, as here, there is no evidence of a juror's hostility to questioning concerning racial prejudice, the mere fact of questioning a potential juror does not ordinarily create bias such that a peremptory challenge is rendered permissible on that ground.

Following the defendant's improper challenge, the judge seated Juror no. 16 and proceeded with the trial. The judge's chosen course of action — disallowance of the challenge and retention of the already seated jurors — was eminently appropriate, as "[n]othing in *Soares* suggests that a defendant, whose misuse of peremptory challenges proves unsuccessful, is entitled to select a new jury from a new venire." *Commonwealth v. Hutchinson*, 395 Mass. 568, 572-573 (1985). There is no basis in the record for us to conclude that the bias of Juror no. 16 was "manifest" such that a finding of an abuse of discretion is required. *Commonwealth v. Seabrooks*, 433 Mass. 439, 443 (2001). In light of the judge's strict and considered adherence to the requirements of *Soares*, *supra*, and *Harris*, *supra*, we conclude that the jury as constituted was fair and representative.

b. *Limiting instruction on prior inconsistent statements*. The defendant maintains that the judge erred in limiting the jury's use of Pape's prior inconsistent statements — that the defendant had not committed the murder and instead had been with her in the bathroom at the time — to an assessment of Pape's credibility as a witness. The defendant contends that the unobjected-to limiting instruction resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth v. McCray*, 457 Mass. 544, 552 (2010), quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992) (pursuant to G. L. c. 278, § 33E, where claim of error is unpreserved, we "consider whether there was an error

in the course of the trial [by defense counsel, the prosecutor, or the judge] and, if there was, whether that error was likely to have influenced the jury's conclusion").

We need not decide whether this instruction was given in error. Assuming, without deciding, that it was,[27] the provision of the instruction did not give rise to a substantial likelihood of a miscarriage of justice.

There was overwhelming evidence, beyond Pape's testimony, as to the defendant's guilt. During the trial, numerous witnesses described the events of August 7, 2004, and their perception of events leading up to the shooting. The defendant himself admitted in police interviews to having threatened the victim with the gun by aiming it at the victim's forehead. This was only minutes before the victim was shot with the same gun in the very spot where the defendant had aimed it. Richard Ford testified that, shortly before the shooting, the defendant stated to the victim, "You were my friend. How could you steal my shit? I should kill you." Five seconds later, Ford heard a gunshot followed by a loud thud. Christopher Rose testified that the defendant "put the gun to [the victim's] head" and "told him he was going to die," and that, after Rose heard the gunshot, he saw the defendant "holding the gun up towards [the victim]"; Rose later stated that he "saw" the defendant shoot the victim.[28] Rose also testified that, after the shooting, he saw the defendant "wipe the gun down."

The jury learned that the defendant had provided police with the clothes he had purportedly been wearing at the time of the shooting. Instead, and consistent with consciousness of guilt, he had in fact been wearing different clothes when the victim was shot. The jury heard a recorded conversation between the defendant and Pape in which they discussed what each had told the police about the shooting. When their statements concerning

[27]We note that defense counsel never sought to admit the prior inconsistent statements as substantive evidence, at no point suggested that the evidence was being used substantively, did not object to the instruction limiting use of the statements solely to determinations of credibility, and even characterized the testimony as "impeachment by prior inconsistent statement."

[28]Certain prior inconsistent statements by Rose were similarly limited; any purported error with respect to the instruction did not give rise to a substantial likelihood of a miscarriage of justice for the same reasons.

their exact location at the time of the shooting did not align, Pape said, "[S]ee, now the story is all fucked up," indicating that their "story" had been contrived.[29] The overwhelming weight of the evidence implicated the defendant in the shooting.

Significantly, the limiting instruction did not affect the defendant's ability to rebut the Commonwealth's case. In alleging prejudice, the defendant claims in a general way that the limiting instruction "removed valuable and directly exculpatory information" from the jury's consideration. We are hard pressed to see how this was likely to have influenced the jury's conclusion.

The distinction between substantive admissibility and admissibility solely for credibility purposes can, of course, be vitally important where the Commonwealth seeks to prove the truth of a prior inconsistent statement; without substantive admission of the statement, the Commonwealth might not be able to prove its case. Defendants, however, need not "test or produce any evidence." *Commonwealth* v. *Laguer*, 448 Mass. 585, 598 n.30 (2007). To acquit the defendant, the jury did not need to believe the truth of Pape's prior statements, i.e., that she and the defendant were in the bathroom while Wells was shot in the kitchen. The jury simply needed to disbelieve Pape's trial testimony, i.e., that she saw the defendant shoot Wells. The latter was a determination that the judge's instruction allowed, conveying as it did the jury's ability to use Pape's inconsistency to assess her credibility.[30] Indeed, the extensive cross-examination of Pape revealed a litany of prior inconsistent statements she had made on a number of matters, all of which undermined her credibility and allowed the jury to disbelieve her trial testimony.

---

[29]A considerable amount of physical and testimonial evidence also went to the implausibility of the defendant's alternative theories of suicide or of Christopher Rose being the shooter. For example, forensic evidence established that the rifle was two inches away from the victim's forehead when he was shot, making suicide unlikely. Presumably for this reason, although the prior inconsistent statements and the defendant's own statements described a suicide, defense counsel did not pursue this theory in closing argument. Additionally, the testimony of every eyewitness stated that Christopher Rose had pushed the gun away from the victim and consoled him after the angry defendant had threatened him. No evidence, other than his presence at the scene, implicated Rose in the shooting.

[30]To the extent the defendant alleges that any error raises concerns of a constitutional magnitude, his claim is unavailing.

See note 10, *supra.* The jury, in reaching their verdicts, either credited her trial testimony or convicted the defendant on the basis of the other overwhelming evidence against him. Either way, the instruction could not have given rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ashley,* 427 Mass. 620, 627-628 (1998) (where defendant had objected at trial and, unlike here, had preserved error, prior inconsistent statements as to identity that had been erroneously limited to credibility purposes only resulted in "no harm" to defendant).

3. *Review under G. L. c. 278, § 33E.* Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to reduce the verdict of murder in the first degree or to require a new trial.

*Judgments affirmed.*