# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* SOULEYMANE YACOUBA ISSA.[1]

Middlesex. January 11, 2013. - July 18, 2013.

Present: SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Practice, Criminal,* Jury and jurors, Empanelment of jury, Challenge to jurors, Reciprocal discovery, Instructions to jury, Voluntariness of statement, Argument by prosecutor, Capital case. *Constitutional Law,* Jury, Voluntariness of statement. *Jury and Jurors. Evidence,* Exculpatory, Credibility of witness, Authentication.

At a criminal trial, the judge did not abuse his discretion by allowing the prosecutor to exercise a peremptory challenge of the only African-American male juror remaining in the venire, where, looking at the totality of the circumstances, the defendant failed to make a prima facie case of bias sufficient to rebut the presumption that the challenge had been properly made. [7-11]

---

[1]As is our custom, we refer to the defendant by the name appearing in the indictment.

At a criminal trial, the judge did not abuse his discretion by imposing sanctions and issuing jury instructions in response to the defendant's violation of a reciprocal discovery order, in that the judge carefully and thoughtfully crafted a balanced remedy that allowed the defendant to offer the evidence he had failed timely to disclose in accordance with the reciprocal discovery order and preserved the Commonwealth's ability effectively to challenge the credibility of the witness (through whose testimony the evidence was to be admitted) and the authenticity of the evidence. [11-19]

At a murder trial, the judge did not err in declining to give a jury instruction concerning statements made by the defendant during an unrecorded police interview, where the defendant voluntarily and without advance notice showed up at the police station to speak to the police about the victim's death within two hours of the discovery of her body; and where the police had not asked the defendant to do so, had yet to ascertain that the cause of death was homicide, and had not identified the defendant as a suspect. [19-21]

At a criminal trial, no prejudice arose from certain statements made by the prosecutor in closing argument [21-22]; further, certain other statements made in closing argument by the prosecutor did not create a substantial likelihood of a miscarriage of justice [22].

INDICTMENT found and returned in the Superior Court Department on May 28, 2009.

The case was heard by *Bruce R. Henry*, J.

*Robert L. Sheketoff* for the defendant.

*Anne Pogue Donohue*, Assistant District Attorney, for the Commonwealth.

GANTS, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation, in violation of G. L. c. 265, § 1, for the killing of Maryse Antoine (victim), the mother of his young daughter.[2] The defendant raises four issues on appeal. First, he claims that the trial judge erred in allowing the prosecutor to exercise a peremptory challenge of the only African-American male who remained in the venire without determining that the prosecutor had a bona fide group-neutral reason for the challenge, and thereby denied him his State and Federal constitutional rights to equal protection and a fair and impartial jury. Second, he contends that the judge's sanctions and jury instructions, which were crafted in response to defense counsel's violation of an order of reciprocal

[2]The jury did not convict the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.

discovery, denied him his State and Federal constitutional rights to a fair trial. Third, he maintains that the judge erred in failing to provide the jury with the instruction required in *Commonwealth v. DiGiambattista*, 442 Mass. 423, 447-448 (2004), regarding his unrecorded interview with the police that followed his voluntary arrival at the police station a few hours after the victim's body had been discovered. Fourth, the defendant claims that the prosecutor made various improper and prejudicial statements in her closing argument. For the reasons detailed below, we affirm the conviction and, after a complete review of the record, decline to exercise our plenary authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt.

*Background.* We summarize the evidence supporting the conviction, reserving certain details of the trial for our discussion of the alleged errors.

The defendant and the victim had dated, lived together, and parented a daughter, who was born in 2005. During the course of their relationship, the victim's family members and friends had observed the defendant "scream" at her, slap and punch her, threaten to strike her with a chair, threaten her life and that of her family, and tell her that he would find a way to kill her without using a gun. The defendant demanded to know with whom the victim had been and what she had been doing, and used her cellular telephone to identify unknown callers.[3]

In March, 2009, they no longer lived together, but the defendant often visited and stayed overnight at the victim's home in Waltham, where she lived with her eighteen year old son and three and one-half year old daughter. In the months leading up to her death, the victim and the defendant had been planning to initiate a cleaning business. The defendant lived in Taunton and, unbeknownst to the victim's family, had married and was living with his wife, Susan Dubuc.

On the evening of March 20, 2009, the defendant visited the victim for three hours at her home, where they tested cleaning products. On March 21, a sister of the victim (Guile Sautier) and her family visited the victim at her home, and remained

---

[3]The defendant once had broken the victim's cellular telephone in two.

there from approximately 4:30 P.M. to 8:30 P.M. At approximately 10:15 P.M., the victim telephoned her teenage son and asked him to come home to take care of his sister because she had to "meet him at a site"; her son understood her to mean that she was going to meet the defendant at a cleaning site. Her son returned home around 10:30 P.M., and the victim soon left. At approximately 10:50 P.M., the victim telephoned her son and asked if he wanted her to bring him something to eat. The victim did not return home the next morning and did not answer her son's telephone calls, so the son contacted the victim's two sisters and the defendant. The defendant told the son that he had not spoken with the victim since 6:30 P.M. on March 21, and that he had not met with her that evening.

The victim often visited another sister, Yves Nelson, who lived nearby in Waltham. The victim had keys to Nelson's apartment. Nelson had stayed overnight with relatives on March 21 and returned home to her apartment at approximately 4 P.M. on March 22. After unlocking the apartment door, she found the victim lying on the living room floor, apparently lifeless, and telephoned 911.[4] The victim's pants had been pulled down, there were bleach stains on her jacket and on the rug near her body, a capped needle from a syringe was on the floor a few feet from her body, and a small piece of dark blue string was next to her shoulder. The victim showed signs of rigor mortis, and was later declared dead.

At the crime scene, apart from the piece of dark blue string on the floor next to the victim's shoulder, investigators observed a brown mark around the victim's neck, a tiny piece of string embedded in her neck, and a piece of dark blue string around the right side of her neck. A medical examiner opined that the victim's death was caused by strangulation by ligature. A swab taken from the broken string found near the victim's right shoulder was submitted for Y-chromosome short tandem repeat (Y-STR) deoxyribonucleic acid (DNA) testing, which looks only at DNA from the Y-chromosome, found only in males, and compares the questioned DNA profile, not with a particular individual's DNA profile, but with the DNA profile of the

---

[4]There were no signs of forced entry into the apartment.

paternal lineage of a family.[5] The Y-STR DNA testing revealed that the defendant's paternal lineage was a potential contributor of the DNA profile taken from the string; the probability of inclusion was one in 1,156 in the African-American population, which meant that the DNA on the Y-chromosome of 99.91 per cent of African-American men would not match the DNA profile from the string.[6]

The police also removed a gummy substance that covered the peephole on the door leading into Nelson's apartment. Short tandem repeat (STR) DNA testing was conducted of a swab taken from that substance, and the defendant's DNA was found to be a potential contributor to the DNA from that swab. The probability that a randomly selected individual would have that DNA profile was one in 66.23 quadrillion for the African-American population.

The defendant stipulated at trial that the white residue on a capped needle from a syringe found near the body was acetaminophen and codeine. Toxicological testing performed by the Commonwealth revealed that neither drug was present in the victim's body. The defendant worked in a quality control laboratory where he had access to an area that required a special pass for admittance where capped needles of the same size and type were stored in an unlocked drawer.

Waltham police Detective Lieutenant Brian Navin and Detective Patrick Hart arrived at Nelson's apartment at 5:40 P.M., but were soon summoned back to the police station after being told that the victim's former boy friend (the defendant) had arrived at the station. Navin and Hart spoke with the defendant in an upstairs room at the station for approximately thirty minutes; the interview was not recorded. The interview began with the defendant answering the detectives' questions about the victim's

---

[5] In other words, the defendant's profile resulting from Y-chromosome short tandem repeat (Y-STR) deoxyribonucleic acid (DNA) testing is identical to the profile of his brothers, their father, and their forefathers. One of the defendant's brothers, Issoufou Yacouba-Issa, resided in Massachusetts at the time of the killing and had visited the apartment where the victim's body was found in March of 2009, but denied any connection to the tested string.

[6] DNA testing was also conducted of a swab taken from the fingernails of the victim, which revealed a DNA mixture from at least two individuals. One of the DNA profiles matched the defendant's paternal lineage. The probability of inclusion was one in fourteen for the African-American population.

physical and mental health, which they asked because they did not yet know what caused the victim's death. The defendant described his whereabouts on the previous day. He said that he had gone to Nelson's apartment at 6:30 P.M. on March 21 to pick up his daughter (who was not there), and met with the victim for approximately one-half hour. He said that the victim had invited him inside the apartment, but he remained in the entryway. He said that he then went to the victim's apartment in search of his daughter, but nobody was home, so he left. He said he then drove to pick up Dubuc, who was waiting for him at a pharmacy in Waltham, and went with her first to a restaurant in Waltham and then to a department store in Waltham. He said he then left Dubuc at a tavern in Waltham at approximately 9 P.M., drove back to the victim's apartment (and found no one home), drove to a brother's residence in Waltham to pick up mail, returned to the tavern, and drove home with Dubuc to Taunton.

Other evidence contradicted the time line given by the defendant concerning his whereabouts on March 21. He told the police that he spent time with the victim at Nelson's apartment at 6:30 P.M., but the victim was at her home with Sautier and her family from approximately 4:30 P.M. to 8:30 P.M., and had stepped out for only a few minutes to retrieve a pair of pliers from her vehicle. Independent evidence corroborated that the defendant had left Dubuc at a tavern in Waltham at approximately 9 P.M., but, although Dubuc had stepped out of the tavern and returned, she did not finally depart until approximately 11:40 P.M., which is substantially later than the time necessary for the defendant to have left the tavern, gone to the victim's apartment to find no one home, pick up mail at his brother's home in Waltham, and return to the tavern to pick up Dubuc. Cellular telephone records revealed that Dubuc repeatedly telephoned the defendant between 9:46 P.M. and 11:40 P.M., but there is no record of his receipt of these calls or the location of his telephone during this time period, which suggests that the defendant's telephone was turned off or without battery power during this time period. The next call involving the defendant's telephone occurred at 12:39 A.M. on March 22, at which point the telephone was located in the Taun-

ton area.[7] The discrepancy in this time line is critical because, according to cellular telephone records, the victim was alive at 10:54 P.M. on March 21, when she made her last telephone call, which was to Nelson.[8]

The defendant was indicted by a grand jury in May, 2009, on a charge of murder in the first degree and a charge of stalking, in violation of G. L. c. 265, § 43 (a). On November 12, 2010, a jury convicted the defendant of stalking but could not reach a verdict on the murder indictment. He was retried on the murder indictment in August, 2011, and convicted. The jury at the second trial did not learn that the defendant had been convicted of stalking the victim.

*Discussion.* 1. *Jury selection.* The defendant claims that the judge denied him his right to a jury selected free from discrimination by allowing the prosecutor to exercise a peremptory challenge of a prospective African-American male juror (juror no. 15).

During his voir dire on the second of four days of jury selection, juror no. 15 informed the judge that he had been arrested and charged with criminal trespass in Kansas thirteen years earlier and that, as a result of that charge, he "went to jail for forty-eight hours."[9] In answer to the judge's questions, he said that his experience with the legal system would not affect him if he were to serve as a juror in the case and had left him with no feelings about the criminal justice system, police, district attorneys, defense attorneys, or judges. After juror no. 15 left the voir dire, the prosecutor told the judge that "he looks very familiar to me and I'm just trying to place him." The prosecutor did not challenge the juror for cause but did use a peremptory challenge to excuse him. The defendant's counsel objected to

---

[7]Susan Dubuc testified that the defendant, using a charger, telephoned her when they returned home to enable her to locate her cellular telephone.

[8]The medical examiner was unable to ascertain from the condition of the body the time of death beyond concluding that it occurred more than twenty-four hours before the autopsy, which was conducted at 1 P.M. on March 23. The defendant argued that the victim died after 4:30 A.M. on March 22, because rigor mortis was observed when her body was discovered.

[9]In the juror questionnaire, the prospective juror (juror no. 15) checked the boxes for "been arrested," "been charged with a crime," and "been served with a court order," but not the box for "been convicted of a crime." We infer that the time in jail was not served pursuant to a conviction.

the prosecutor's challenge, noting that this prospective juror is "probably the only African-American or African man" remaining in the venire.[10] The judge recognized that the peremptory challenge of one juror may constitute a pattern, but did not find "that there [was] a pattern at this point in time," and allowed the exercise of the prosecutor's challenge without asking the prosecutor to explain why she challenged this prospective juror.

The defendant argues that a new trial is required because the judge did not require the prosecutor to explain her reason for the peremptory challenge, and made no determination whether her real reason was that juror no. 15 was an African-American male. "The use of peremptory challenges to exclude prospective jurors solely because of bias presumed to derive from their membership in discrete community groups is prohibited both by art. 12 [of the Massachusetts Declaration of Rights], see *Commonwealth* v. *Soares*, 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979), and the equal protection clause, see *Batson* v. *Kentucky*, 476 U.S. 79, 84-88 (1986)." *Commonwealth* v. *Harris*, 409 Mass. 461, 464 (1991) (*Harris*). "We presume that peremptory challenges are properly made, but this presumption can be rebutted by a prima facie showing of either a pattern of challenges of members of the same discrete group, [*Commonwealth* v.] *Soares*, *supra* at 473-474 n.8, or, in certain circumstances, challenge of a single prospective juror within a protected class, [*Harris*, *supra* at 465], where 'there is a likelihood that [a prospective juror is] being excluded from the jury solely on the basis of . . . group membership.' " *Commonwealth* v. *Prunty*, 462 Mass. 295, 306 (2012) (*Prunty*), quoting *Commonwealth* v. *Burnett*, 418 Mass. 769, 770 (1994). The test, therefore, is twofold: first, a pattern, which in some circumstances may be a pattern of one; and second, a likelihood of group exclusion, which in some circumstances can be discerned solely from the strength of the pattern. See *Commonwealth* v. *Garrey*, 436 Mass.

---

[10]Juror no. 15 had been born in Uganda. The defendant's counsel acknowledged that another prospective African-American male juror had been excused earlier. Although the record does not identify any prospective juror by race other than the one at issue, the record reflects that another prospective male juror, with a presumably African surname, had earlier been excused for cause by the judge because he had scheduled a vacation to visit his sister, who had come from Ethiopia for medical care, that he would have had to cancel if he sat as a juror.

422, 428 (2002) (*Garrey*), quoting *Commonwealth* v. *Curtiss*, 424 Mass. 78, 80 (1997) (*Curtiss*) ("presumption may be rebutted on a showing that '[1] there is a pattern of excluding members of a discrete group and [2] it is likely that individuals are being excluded solely on the basis of their membership within this group' "). See also *Batson* v. *Kentucky*, *supra* at 96 (prima facie showing requires that [1] peremptory challenge was exercised against member of protected group and [2] "other relevant circumstances raise an inference" that peremptory challenge was used to exclude potential juror because of membership in that group). Accord *State* v. *Rhone*, 168 Wash. 2d 645, 654-655, cert. denied, 131 S. Ct. 522 (2010), and cases cited (prima facie showing requires "something more" than peremptory challenge against member of racially cognizable group). Among the factors that may be considered are the "numbers and percentage of group members excluded," and whether the challenged jurors are members of the same constitutionally protected group as the defendant or the victim. *Garrey*, *supra*, quoting *Commonwealth* v. *Robinson*, 382 Mass. 189, 195 (1981). See *State* v. *Rhone*, *supra* at 656 (listing eight nonexclusive factors relevant to determine whether prima facie case has been shown); *People* v. *Rivera*, 221 Ill. 2d 481, 501 (2006), appeal after remand, 277 Ill. 2d 1 (2007), aff'd, 556 U.S. 148 (2009) (listing seven relevant factors). "There is no per se rule." *Garrey*, *supra*.

We have often declared that a single peremptory challenge may be sufficient to rebut the presumption, especially where "the challenged juror is the only member of his or her protected class in the entire venire." *Prunty*, *supra* at 306 n.15. See *Commonwealth* v. *Rodriguez*, 457 Mass. 461, 470 (2010), overruled on another ground, *Marshall* v. *Commonwealth*, 463 Mass. 529 (2012), quoting *Harris*, *supra* at 466; *Garrey*, *supra*. See also *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463 n.4 (2003) (*Maldonado*) ("In order to ensure that the important protections set forth in *Commonwealth* v. *Soares*, *supra* at 491, are fully adhered to, the burden of making this showing ought not be a terribly weighty one"). Therefore, the judge in his discretion may have found a prima facie case here, where the prosecutor used a peremptory challenge to exclude the only African-American male remaining in the venire. See *Commonwealth* v. *Jordan*, 439 Mass.

47, 58-62 (2003) (art. 12 not only prohibits bias in jury selection based on race *or* gender, but also based on combination of race *and* gender; peremptory challenge may not be exercised to exclude juror because juror is African-American male or Caucasian female).

The issue on appeal, however, is not whether the judge was permitted to find that the presumption had been rebutted, but whether he was required to have so found. Recognizing it to be a close question, we conclude, looking at the totality of the circumstances, that the judge did not abuse his discretion in finding that the defendant had failed to rebut the presumption. See *Commonwealth* v. *Scott*, 463 Mass. 561, 571 (2012) (finding of no pattern of discriminatory challenges within judge's discretion); *Commonwealth* v. *Sanchez*, 79 Mass. App. Ct. 189, 192, cert. denied, 132 S. Ct. 408 (2011) (same). Cf. *Snyder* v. *Louisiana*, 552 U.S. 472, 477 (2008) (where prima facie case has been shown, "trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous"). The defendant satisfied the first part of the test by showing that the prosecutor had challenged the only African-American male remaining in the venire. But in evaluating the second part of the test, the judge was entitled also to consider "other relevant circumstances" available to him in deciding whether the defendant adequately rebutted the presumption that the prosecutor made a proper challenge. See *Batson* v. *Kentucky*, *supra* at 96-97 ("In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances"). See also *Commonwealth* v. *Matthews*, 31 Mass. App. Ct. 564, 569-570, cert. denied sub nom. *Matthews* v. *Rakiey*, 504 U.S. 922 (1992).

The judge noted that a female juror who had been born in Africa had been seated as a juror.[11] Although this did not dispel the possibility that the prosecutor retained a bias against African-

---

[11]The record reflects that, on the first day of jury selection, a woman who indicated that she was born in Kenya was seated as a juror. Although we recognize that one can be Caucasian and still be born in Kenya, we think it likely from her African surname that she is a black African-American. See *Commonwealth* v. *Carelton*, 418 Mass. 773, 774-775 (1994) (finding discrimination on basis of ethnicity when considering prosecutor's peremptory challenges of jurors with "Irish-sounding surnames").

American males sitting on the jury, it did suggest that she did not hold a bias against African-Americans who were born in Africa. The judge also recognized that both the defendant and the victim were African-American,[12] so any inference of bias in jury selection arising from an interracial killing was not warranted. See *Commonwealth* v. *Roche*, 44 Mass. App. Ct. 372, 377-378 & n.3 (1998) (where both defendant and victim were white, judge erred by denying defendant's peremptory challenge of only black prospective juror because there was no additional evidence of racial motive for challenge). Perhaps most important, the prosecutor had informed the judge that the prospective juror "look[ed] very familiar" and that she was "trying to place him." The judge was entitled to infer that the reason the prosecutor told the judge that the prospective juror "look[ed] very familiar" was because she recognized that there was a risk that, if the prosecutor had later been able to "place" the prospective juror after he became a sitting juror, the juror may have needed to be excused from the jury panel. In view of these circumstances, which diminished the likelihood that the reason for the prosecutor's challenge to the only African-American male in the venire was solely the prospective juror's race and gender, we conclude that the judge did not abuse his discretion in finding that the defendant had fallen short of making a prima facie case of bias.[13,14]

2. *Sanctions for defense counsel's discovery violation.* The

[12]The victim was an African-American female who was born in Haiti. The defendant is an African-American male who was born in Niger.

[13]We do not consider in our analysis the prospective juror's arrest thirteen years earlier in Kansas for criminal trespass, which resulted in his spending forty-eight hours in jail. Where there is nothing in the record to suggest that this experience would have affected the prospective juror in his evaluation of the case, we would not find it reasonable for a prosecutor to rely on this arrest as a basis for challenging a prospective juror, especially where, as here, the prosecutor did not challenge other jurors with similar criminal experiences. See *Commonwealth* v. *Maldonado*, 439 Mass. 460, 467 (2003) (*Maldonado*) (genuineness of explanation "significantly impaired by the absence of consistency in its application to other jurors"); *Commonwealth* v. *Futch*, 38 Mass. App. Ct. 174, 177 (1995) ("For the purposes of peremptory challenges, the term 'neutral' is defined as a reason which is not present in those nonminority panel members not struck").

[14]Although we find no abuse of discretion, we note that the judge created a significant and needless risk of reversal by failing to require the prosecutor to

defendant claims that the judge's sanctions and jury instructions, crafted in response to defense counsel's violation of a reciprocal discovery order, denied him his State and Federal constitutional rights to a fair trial.

At a hearing on July 26, 2011, one week before the commencement of trial, the judge allowed the Commonwealth's motion for reciprocal discovery, which required the defendant, among other obligations, to provide the Commonwealth with all "tangible objects" that the defendant "intends to use as evidence at trial." The judge orally directed the defendant to turn over the required reciprocal discovery "as soon as possible" to avoid

---

explain her reasons for challenging juror no. 15. Where a venire contains few African-Americans, a judge "has broad discretion" to require a prosecutor to explain a challenge of a prospective African-American juror "without having to make the determination that a pattern of improper exclusion exists." *Commonwealth* v. *Scott*, 463 Mass. 561, 571 (2012), quoting *Commonwealth* v. *Van Winkle*, 443 Mass. 230, 236 (2005). If the judge had required an explanation, the prosecutor would have needed to show that the explanation for the challenge was "bona fide" group-neutral. *Maldonado*, *supra* at 463-464. The defendant should then have been given an opportunity to reply before the judge made his findings as to discriminatory intent. *Commonwealth* v. *Calderon*, 431 Mass. 21, 26 (2000). In finding whether an explanation is "bona fide," a judge must determine both whether it is "adequate," that is, clear, reasonably specific, and personal to the juror rather than based on the juror's group affiliation, and "genuine," that is, the true reason for the challenge. *Maldonado*, *supra* at 464-465, quoting *Commonwealth* v. *Burnett*, 418 Mass. 769, 771 (1994). See *Commonwealth* v. *Garrey*, 436 Mass. 422, 428 (2002), quoting *Commonwealth* v. *Burnett*, *supra*. The judge's findings should separately address both the adequacy and genuineness of the explanation. *Maldonado*, *supra* at 466. Where, as here, a judge fails to find a prima facie case or otherwise require the prosecutor to provide an explanation, the record on appeal includes no explanation of the prosecutor's reasons for the challenge, the defendant is not given an opportunity to reply to the explanation, and the judge does not make the required findings as to the adequacy and genuineness of the prosecutor's explanation. Therefore, where a judge abuses his or her discretion by failing to find a prima facie case, the error is unlikely to be harmless. See *Commonwealth* v. *Long*, 419 Mass. 798, 807 (1995); *Commonwealth* v. *Futch, supra* at 177-178. Consequently, when a defendant claims that a prosecutor's peremptory challenge of a prospective juror is motivated by discriminatory intent, we urge judges to think long and hard before they decide to require no explanation from the prosecutor for the challenge and make no findings of fact. Cf. *Maldonado*, *supra* at 463 n.4, citing *Commonwealth* v. *Soares*, 377 Mass. 461, 486-488, cert. denied, 444 U.S. 881 (1979) (noting that some State courts require inquiry into prosecutor's explanation for challenge "whenever a *Soares*-type objection is made to the use of a peremptory challenge").

any issue about "unfair surprise." Before trial, defense counsel furnished the prosecutor with reciprocal discovery pursuant to that order, but did not produce any jacket or athletic pants.

In the first sentence of the prosecutor's opening statement, she told the jury that the defendant murdered the victim by using "a drawstring" as a ligature around her neck and strangling her. At trial, the Commonwealth offered in evidence a surveillance videotape made by a department store in Waltham that showed the defendant and Dubuc inside the store during the early evening of March 21, 2009. From the videotape and photographs made from the videotape, the defendant can be seen wearing a dark-colored jacket and athletic pants. The Commonwealth offered in evidence an exemplar of a jacket that was similar to the jacket that the defendant wore at the department store, and called several law enforcement officers to show that police investigators searched various locations where the defendant's clothing was kept but did not find the jacket or athletic pants that the defendant wore on the evening of March 21. The inference invited by this evidence was that the defendant had caused the jacket and athletic pants he wore that evening to be discarded or concealed, suggesting his consciousness of guilt.[15]

On the sixth day of testimony, after eliciting testimony on cross-examination that the defendant had been observed by police wearing the jacket on March 22 and 23, defense counsel reached into his briefcase and pulled out a jacket that appeared identical to the exemplar the Commonwealth had offered in evidence. The prosecutor immediately objected. Defense counsel proffered that he possessed both the jacket and the athletic pants, with a fully intact drawstring, that the defendant wore on the evening of March 21, and intended to offer them in evidence through Dubuc's testimony. The prosecutor moved to exclude the jacket and pants as a sanction for the defendant's failure timely to produce the jacket and pants in accordance with the judge's order of reciprocal discovery.

At a subsequent hearing, defense counsel admitted that he should not have pulled the jacket out in front of the jury, and

---

[15]From this evidence, the jury could have inferred that the defendant feared that the clothing might contain forensic evidence or, with respect to the pants, reveal a missing drawstring.

acknowledged that it was not fair to the Commonwealth "for [him] to do it that way." He claimed not to be certain that he was going to offer the jacket and pants in evidence until the fifth day of testimony, and denied that he committed any discovery violation.

The judge found that the defendant had violated the order of reciprocal discovery, and that "there clearly was surprise here" regarding "clearly material evidence." The judge found that defense counsel acted in "bad faith . . . in the manner and timing of [the] disclosure," and that defense counsel's conduct was "not only unfair," but "egregious." The judge also found that the Commonwealth was prejudiced by defense counsel's conduct in that "it was very clear what the prosecution was aiming to argue about the particular evidence which . . . nobody on the prosecution side knew was in existence," and that the prosecution took a strategic path "that potentially might not have been taken had that information been disclosed earlier." However, the judge also recognized that the jacket and athletic pants purportedly worn by the defendant on March 21 were "important evidence . . . that the jury ought to be able to . . . evaluate," and that exclusion of the evidence "is a sanction of last resort."

The judge admittedly "wrestle[d] with" the issue of an appropriate sanction. In an effort to craft an appropriate sanction, the judge heard voir dire testimony from various witnesses, including Dubuc and Elizabeth Lunt, the defendant's counsel at his first trial, regarding the circumstances of Dubuc's disclosure of the existence of the jacket and athletic pants to Lunt.[16]

Over the defendant's objections, the judge ultimately crafted a set of sanctions and jury instructions that allowed the jacket and athletic pants to be admitted in evidence, but also allowed the Commonwealth to challenge Dubuc's credibility regarding the authenticity of the jacket and pants she furnished. Because Dubuc claimed to have recognized the significance of the jacket and pants at the first trial, the judge informed the jury that there was a prior trial in the case, but that they may consider the prior trial only for a limited purpose: to assess the credibility of Dubuc, through whose testimony the jacket and pants were to

---

[16]Attorney Elizabeth Lunt did not represent the defendant in the second trial.

be admitted, and the credibility of the evidence regarding the jacket and pants. The judge also instructed the jury:

"You may not speculate, in any way, about that prior trial or why this case is being tried again. There are many reasons why a case may be re-tried and the reasons for this retrial are irrelevant to your determination of this defendant's guilt or innocence of the charge before you in this trial."[17,18]

Before Dubuc was called as a witness by the defendant, the judge gave the following instruction:

"Ordinarily, a person does not have an obligation to provide . . . potentially exculpatory evidence or potentially inculpatory evidence to the police or to the prosecutor. There are many situations, however, where the natural response of a person in possession [of] exculpatory evidence or information would be to come forward and to provide the authorities with that evidence or that information. If you find that a witness had such potentially exculpatory evidence or information, and if you find that the witness failed to come forward with it, you may consider that failure and any explanation for it, along with all of the other circumstances surrounding it, in evaluating the credibility of that evidence and of the witness providing it."[19]

The judge allowed Dubuc to testify that she told attorney Lunt about the pants before the first trial and about the jacket at the first trial, and discussed them with her, but did not hand them over to her. The judge allowed Lunt to testify that she

---

[17]After the judge informed counsel of his intent to provide this instruction, the defendant sought interlocutory relief from a single justice of this court pursuant to G. L. c. 211, § 3. The single justice denied the petition, noting that "[t]he judge's order appears to be balanced in scope and includes limiting instructions to the jury to safeguard the defendant's right to a fair trial."

[18]The judge gave the jury this instruction both when they first learned of the prior trial and in his final instructions to the jury. The judge did not tell the jury the outcome of the earlier trial.

[19]The judge told the jury that the instruction "relates to" the testimony of Dubuc and of Issoufou Yacouba-Issa, the defendant's brother, who testified that Dubuc showed him the defendant's jacket and athletic pants toward the end of 2010.

learned from Dubuc about the clothing that the defendant wore on the evening of the killing before and during the first trial, but never asked to see the jacket and pants and never saw them. Lunt also testified that she made the decision not to offer the jacket or pants in evidence at the first trial. The judge did not allow Dubuc and Lunt to testify as to what Lunt said to Dubuc regarding the clothing.

The defendant contends that his counsel's late disclosure of the jacket and the athletic pants "caused no prejudice whatsoever," and that the judge abused his discretion by informing the jury of the prior trial, by instructing them that they may consider the failure to produce exculpatory evidence, and by declining to allow Dubuc to testify as to what Lunt told her after she informed Lunt about the jacket and pants.[20] We disagree.

The defendant on appeal does not challenge the judge's finding of a discovery violation. Nor reasonably could he, because there is abundant evidence that, before trial, defense counsel had decided to offer the jacket and athletic pants in evidence but nonetheless failed to comply with the order of reciprocal discovery that obliged him to furnish this clothing in discovery. Defense counsel took advantage of this discovery violation by standing silent as the prosecutor elicited testimony designed to show that this jacket and pants were not found among the clothing searched by the police, inviting the inference that the defendant had caused the clothing he wore when he killed the victim to be discarded or hidden. The judge was entitled to credit the prosecutor's representation that, had she known of the existence of this evidence, she would not have highlighted its absence, offered an exemplar of the jacket in evidence, or suggested that the drawstring of the pants was the ligature used to strangle the victim. See *Commonwealth* v. *Baldwin*, 385 Mass. 165, 177 (1982) ("trial judge's discretion to find prejudice is much broader than ours").

When a party fails to comply with a discovery order, Mass. R. Crim. P. 14 (c) (1), as amended, 442 Mass. 1518 (2004), allows a judge to order sanctions he or she deems just under the

---

[20]The defendant does not challenge the judge's instruction to the jury that the jacket and pants were not provided to the prosecutor until the sixth day of testimony at trial.

circumstances, so long as the sanctions are "remedial in nature" and "tailored appropriately to cure any prejudice resulting from a party's noncompliance and to ensure a fair trial." *Commonwealth* v. *Carney*, 458 Mass. 418, 419 n.3, 427 (2010). A judge's sanctions order will be reversed only for abuse of discretion or other error of law. *Id.* at 425.

The judge here recognized that exclusion of the jacket and pants, the remedy sought by the prosecutor, was the "sanction of last resort," and properly rejected it.[21] Although the judge decided not to exclude the clothing, he recognized that the prosecutor was entitled to challenge the authenticity of the clothing by questioning the credibility of Dubuc's testimony that the jacket and pants she produced were the jacket and pants the defendant wore on the night in question. Because Dubuc claimed that she first realized the significance of the jacket and pants at or just prior to the first trial, and then notified the defendant's first counsel of their existence, the judge reasonably concluded that the jury would need to learn that there was a first trial in order adequately to evaluate Dubuc's credibility and, consequently, the clothing's authenticity. The judge adequately addressed the risk of prejudice with the limiting instruction he gave regarding the first trial. He did not abuse his discretion by allowing the jury to learn of the first trial for this limited purpose.

Nor did the judge abuse his discretion in instructing the jury that they could consider the failure of the defendant's wife and brother to disclose the exculpatory evidence to the authorities, if the "natural response" would be to make such a disclosure, in evaluating their credibility and the authenticity of the jacket and pants. In *Commonwealth* v. *Hart*, 455 Mass. 230, 238 (2009), quoting *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981), we held that such an instruction is appropriate where the necessary foundation has been established: "(1) that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, (2) that the

---

[21]The judge also denied the prosecutor's request to offer evidence that the defendant had previously attempted to strangle the victim with a different string. The prosecutor argued that this prior bad act, which the judge had earlier ruled inadmissible, should have become admissible after the defendant's discovery violation, because it would allow her to argue that the defendant's use of a ligature was not confined to the drawstring on his pants.

witness had reason to make the information available, [and] (3) that he was familiar with the means of reporting it to the proper authorities." The judge did not err in concluding that an adequate foundation had been established to justify this instruction.

Nor did the judge abuse his discretion in limiting the testimony regarding what Lunt said to Dubuc after Dubuc told Lunt that she had the jacket and pants. We know from their voir dire testimony what such questioning would have elicited: Dubuc would have testified that Lunt told her she did not want them because the Commonwealth's evidence was circumstantial and she did not intend to offer evidence as part of a defense case, and Lunt would have testified that she told Dubuc to confer with her own attorney.[22] The jury learned from Lunt that she did not intend to put the jacket and pants in evidence, and the judge reasonably could have concluded that learning that Lunt told Dubuc to confer with her own attorney would not have added much to assist the jury in evaluating the credibility of Dubuc and the authenticity of the clothing, and potentially would have invited the jury to speculate why Lunt thought it wise for Dubuc to confer with her own counsel concerning evidence Dubuc was willing to provide her.

Finally, the defendant contends that the judge erred in allowing the prosecutor to elicit evidence that a State police chemist "processed" a Toyota Corolla automobile and did not see any dark-colored jacket, pants, or string, where the defendant's motion to suppress the search of this automobile had been previously allowed. The judge did not abuse his discretion in allowing this testimony. Before trial, the prosecutor agreed to the defendant's motion in limine to preclude any testimony about the search of this vehicle, provided the defendant did not open the door to the admission of such testimony. The defendant, however, did open the door. The prosecutor had elicited evidence attempting to show that the police had searched all the locations

---

[22]Dubuc was represented by separate counsel at the first and second trials. At the first trial, she invoked her marital privilege and her right against self-incrimination, and did not testify. She waived those rights and testified at the second trial. The judge refused to allow the prosecutor to inquire into Dubuc's assertion of her marital privilege and right against self-incrimination at the first trial, but did allow the prosecutor to elicit that Dubuc "sat through" the first trial.

where the defendant's jacket and pants may have been stored in order to support her argument that the defendant had discarded the jacket and pants. During cross-examination, however, defense counsel elicited that the police saw the defendant approach a Toyota vehicle and retrieve three plastic bags "tied at the top" from the trunk of the vehicle. By eliciting this testimony, defense counsel invited the inference that the search for the defendant's clothing was less than comprehensive because the police had not testified to any search of a Toyota vehicle, where clothes may have been stored in large plastic bags. The limited inquiry that the judge permitted, which allowed testimony only to what was *not* found in the vehicle rather than what was found, was an appropriate remedy to the problem that defense counsel had created by his questioning.

In conclusion, in the face of what the judge appropriately characterized as an "egregious" discovery violation by the defendant, the judge carefully and thoughtfully crafted a balanced remedy that allowed the defendant to offer the evidence he had failed timely to disclose in accordance with the reciprocal discovery order and preserved the Commonwealth's ability effectively to challenge the credibility of Dubuc and the authenticity of the clothing. The judge did not abuse his discretion in doing so.

3. DiGiambattista *instruction.* In *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004) (*DiGiambattista*), we held:

> "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care. Where voluntariness is a live issue and the humane practice in-

> struction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt."

The defendant claims that, because he was interviewed at a police station and the interview was not recorded, the judge erred in denying his request for this instruction regarding statements the defendant made during that interview. We disagree.

In *DiGiambattista*, the defendant voluntarily accompanied a State trooper and a police officer to a fire station to be questioned about a fire that occurred one month earlier, and was told early in the interview that he was their "prime suspect." *Id.* at 425-427. In contrast, here, the defendant voluntarily and without advance notice showed up at the station to speak to the police about the victim's death within two hours of the discovery of her body. The police had not asked the defendant to come in or be interviewed, did not know who the defendant was until he told them, had yet to ascertain that the cause of death was a homicide, and did not identify the defendant as a suspect until after the completion of the interview. In view of these circumstances, we conclude that the judge did not err in refusing to give a *DiGiambattista* instruction.[23],[24]

---

[23]The judge understood that the determination whether the defendant was entitled to the instruction required in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004), rested on whether the police interview constituted an "interrogation." Based on the totality of the circumstances, he concluded that it did not. We understand this finding to be the practical equivalent of a finding that the defendant was not a suspect at the time of the interview, and conclude that the finding was amply supported by the evidence at trial.

[24]We note that the judge in his final instructions gave a humane practice instruction telling the jury that, in assessing whether the defendant's statements to the Waltham police were made voluntarily, they may consider all the circumstances surrounding the making of the statements, including "the policies, practices, or procedures of the police department or agency with regard to such statements." The defendant elicited at trial that Dubuc was told during her interview with Waltham police Officer Patrick Hart on March 23, 2009, that the policy of the department is to record all interviews, but Officer Hart testified that he recorded her interview only because, by the time she was questioned, the investigation had proceeded to the point where her husband had been identified as a suspect. Therefore, the jury were allowed to consider the police department's policy regarding the recording of statements in evaluating the voluntariness of the defendant's statements.

Nothing in the *DiGiambattista* opinion suggests that we anticipated its guidance to apply to an interview that took place before the police had determined that a crime had occurred and before the police had identified a suspect. Nor in *DiGiambattista* did we consider the practical consequences of a rule that encouraged officers to record all interviews conducted at a police station, including interviews of family members or close friends of a person found dead who are not suspected of causing her death.[25] For these reasons, we conclude that the defendant in these circumstances was not entitled to a *DiGiambattista* instruction regarding the statements made during his interview, and the judge did not err in so finding.[26]

4. *Prosecutor's closing argument.* The defendant contends that the prosecutor denied him a fair trial by misstating evidence and the law, and suggesting unwarranted inferences during her closing argument. We evaluate these claims in light of the prosecutor's "entire argument," "the judge's instructions to the jury, and the evidence at trial." *Commonwealth* v. *Ortiz*, 463 Mass. 402, 415 (2012), quoting *Commonwealth* v. *Raposa*, 440 Mass. 684, 694 (2004).

The defendant preserved three claims of improper argument that he raises on appeal: that the prosecutor gave an inaccurate definition of reasonable doubt, that she improperly speculated that the defendant may have gone to the police on March 22 to establish an "alibi," and that she improperly suggested that Dubuc hid the clothes until testing or verification could not be

---

[25]When asked at trial why he did not record the interview with the defendant, Detective Lieutenant Brian Navin replied that it would have shown a lack of courtesy, compassion, and judgment to ask to record an interview of "somebody . . . who [had] just been informed of the death of a loved one."

[26]The defendant also claims that the judge erred by declining to instruct the jury that the failure of police to conduct certain tests and follow certain procedures could raise a reasonable doubt as to the defendant's guilt. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). We have "often stated" that, so long as the judge does not "remove issues of inadequacy of a police investigation or lack of evidence from the jury's consideration . . . 'a judge is not required to instruct on the claimed inadequacy of a police investigation.' " *Commonwealth* v. *Perez*, 460 Mass. 683, 692 (2011), quoting *Commonwealth* v. *Williams*, 439 Mass. 678, 687 (2003). The judge admitted evidence regarding the alleged inadequacies of the police investigation and allowed defense counsel to argue its significance. The judge did not err in declining to give a so-called *Bowden* instruction.

done. Where objections were made at trial, we review for prejudicial error. *Commonwealth* v. *Johnson*, 463 Mass. 95, 112 (2012). We find none here.

As to the first claim, the judge's detailed instructions on reasonable doubt cured any confusion resulting from the prosecutor's abbreviated description of the standard. As to the second, the prosecutor was permitted to suggest that the defendant's motive for going to the police station to describe his whereabouts on March 21 was to persuade the police that he was not at the victim's sister's apartment at the time of the killing because such a suggestion was based on a reasonable inference drawn from the evidence presented at trial. As to the third, the prosecutor erred in asking the jury the rhetorical question, "If they are the pants, why hide them for so long, too long for any tests or verifications to be done?" without having elicited evidence that tests or verifications were no longer feasible, but the error was too inconsequential to be prejudicial.

Additionally, the defendant challenges on appeal multiple statements made by the prosecutor during closing argument that were not preserved by objection. We review these claims of impropriety to determine whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Kater*, 432 Mass. 404, 423 (2000), citing *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999). After reviewing the entire record, we conclude that these challenged statements represented an accurate summary of the evidence presented, were based on reasonable inferences of the evidence, or were cured by the judge's instructions to the jury. See *Commonwealth* v. *Siny Van Tran*, 460 Mass. 535, 556 (2011). They did not create a substantial likelihood of a miscarriage of justice.

5. *Review under G. L. c. 278, § 33E.* Although the defendant does not advance an argument pursuant to G. L. c. 278, § 33E, we have examined the record and discern no basis to exercise our authority to set aside or reduce the verdict of murder in the first degree.

*Judgment affirmed.*