NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12027


COMMONWEALTH  vs.  MAURICE JONES.



Suffolk.     January 10, 2017. - June 20, 2017.

Present:  Gants, C.J., Lenk, Hines, & Budd, JJ.


Homicide.  Jury and Jurors.  Practice, Criminal, Jury and
     jurors, Empanelment of jury, Challenge to jurors, Hearsay,
     Instructions to jury.  Evidence, Identity, Consciousness of
     guilt, Hearsay.  Constitutional Law, Self-incrimination.



Indictments found and returned in the Superior Court
Department on June 26, 2013.

The cases were tried before Linda E. Giles, J., and a
motion to set aside the verdict was heard by her.


James L. Sultan (Kerry A. Haberlin also present) for the
defendant.
Matthew T. Sears, Assistant District Attorney (Julie Sunkle
Higgins, Assistant District Attorney, also present) for the
Commonwealth.


LENK, J.  The defendant was convicted by a Superior Court

jury of murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty in connection with

the shooting death of Dinoriss Alston on April, 17, 2012.[1]  The identity of the shooter was the central issue at trial.  On appeal, the defendant challenges the sufficiency of the evidence, and also asserts a number of errors in the trial proceedings.  He maintains that the judge erred in failing to require the Commonwealth to explain its peremptory challenge of a prospective juror; improperly allowed the admission of evidence as to the defendant's refusal to go to the hospital to be shown to the surviving witness and as to a police radio broadcast describing the shooter; incorrectly instructed the jury that circumstantial evidence would suffice while failing to instruct that mere presence was not enough; and improperly limited the defendant's cross-examination of a Commonwealth witness.  The defendant asserts also that he received ineffective assistance of counsel and requests relief under G. L. c. 278, § 33E.

We conclude that, while the evidence at trial was not by any means overwhelming, it was sufficient to sustain the defendant's convictions.  The judge's failure to require an explanation of the prosecutor's peremptory challenge of a

---

[1] This was the defendant's second trial on these charges; the first trial ended in a mistrial when the jury were unable to reach a verdict.  The defendant also was convicted of assault and battery by means of a dangerous weapon and unlawful possession of a firearm.  He was acquitted of armed assault with intent to murder on charges stemming from the nonfatal shooting of the victim's girl friend, Ashley Platt.

prospective juror who is African-American, however, requires the convictions be vacated. We address other claimed errors only insofar as they may recur at any new trial.

1. Background. Because the defendant challenges the sufficiency of the evidence, we discuss in some detail the facts the jury could have found.

a. The shooting. On the afternoon of April 17, 2012, Alston and his girl friend, Ashley Platt, were sitting in her vehicle near a park on Dunreath Street in the Roxbury section of Boston when they were struck by multiple gunshots. Platt was in the driver's seat, and Alston was in the front passenger's seat. The primary issue at trial was the identity of the shooter.

Platt testified that, on April 17, 2012, an unseasonably warm day, she and Alston went to the beach after she left work at around 11 A.M., and later decided to drive to a park in Roxbury where they frequently spent time, arriving at approximately 3:40 or 3:45 P.M. Platt did not tell anyone about their plans for the day. Alston spoke on his cellular telephone "a couple of times" during the afternoon, including making a call at about 3:07 P.M. to a person identified as "Suncuz."[2] At some point on the drive from the beach to the park, the two stopped at a location in the Grove Hall neighborhood of Roxbury, where Alston spoke briefly to a man Platt did not know; when he

_____

[2] "Suncuz" was never identified.

returned to the vehicle, Alston's demeanor remained "normal." Platt then drove to a convenience store, where Alston made a purchase while she remained in the vehicle, and the two then made their way to Dunreath Street near the park.[3]  After they stopped, they remained in the vehicle smoking marijuana, while Platt used her cellular telephone to send messages.

Twenty to thirty minutes later, at around 4:03 P.M., someone opened fire on the vehicle.  Bullets came through the windshield and struck Alston, who was in the front passenger's seat, multiple times in the right side of his neck, the right side of his chest, and through his right elbow.[4]  Alston reached down and put the vehicle in gear and told Platt, who was in the driver's seat, to "go."  Platt drove rapidly away from the scene and sought help at a nearby gasoline station on the corner of Moreland Street and Blue Hill Avenue.  Emergency responders pronounced Alston dead at the scene, and discovered that Platt also had been shot; she was transported to the hospital in the ambulance that had been summoned for Alston.

b.  The investigation.  i.  Flight from the scene.  Platt did not see the shooting itself or anyone carrying a firearm;

_____

[3] The video surveillance system at the convenience store showed Alston entering the store, making a purchase, and leaving the store without speaking to anyone other than the cashier.

[4] The medical examiner who performed the autopsy testified that Alston died of gunshot wounds, and that three of the five wounds independently could have been fatal.

she saw the windshield cracking and glazing and an individual walking calmly away from the parked vehicle, along Dunreath Street, who ignored her screams for help. She did not see anyone else nearby. At trial, Platt described the individual, whom she saw only from behind, as a black male wearing a white and red shirt, khaki cargo shorts,[5] a black and red hat, and Chuck Taylor sneakers, a distinctive brand of shoes that were primarily black but have a white "rubber front." She lost track of him after driving past him on Dunreath Street.

Because Platt did not see the shooter's face, and thus was unable to identify him, the Commonwealth relied on testimony from a number of other witnesses to establish the defendant's familiarity with the area near the shooting. His former girl friend, who lived in that neighborhood, testified that the defendant had grown up in the neighborhood and continued to come by frequently to visit her. She testified that she spent the evening of the shooting with the defendant "like a normal day," and that he had been "shocked" by the fact that a shooting had taken place nearby.

---

[5] Cargo pants are "loose-fitting, casual pants having a number of cargo pockets, some typically on the side of the upper leg." A cargo pocket, in turn, is "a capacious pocket sewn onto the outside of a garment or bag, often having a flap and side pleats." Webster's New World College Dictionary 226 (5th ed. 2016).

Another of the defendant's friends testified that, before the shooting, he had seen the defendant in the neighborhood several times a week, but, after the shooting, saw him in the area much less frequently. When asked why he no longer spent time in the area, the defendant replied "the block is hot," which his friend understood to mean that "there [are] cops everywhere."

In addition to Platt's description of the shooter, the Commonwealth introduced testimony from a number of witnesses along the purported path of flight away from the scene of the shooting. Byrain Winbush was at home watching television, near the corner of Warren Street and Dunreath Street, when he heard a series of shots, which sounded as though they had been fired from a semiautomatic firearm. He looked out his window and telephoned 911. Both in his testimony and in the audio recording of the 911 call, which was played for the jury, he described seeing a black male, whom he could see only from behind, wearing "yellow shorts," a "white shirt," and socks and sneakers, without a hat, running up the street. He could see the individual's hands and did not notice a weapon. Although he heard screaming and the sounds of "scattering" feet, he did not see anyone else. The individual with the white shirt and yellow shorts remained in view until he reached the corner of the nearby park.

Leonor Woodson was sitting near the window of her home on Dunreath Street, across the street from the park, when she heard multiple gunshots and looked out the window. Her sister, Leila Jackson, also heard the shots and ran to the window.[6] Both saw a black man wearing light pants with pockets on the side, a dark colored jacket,[7] and a cap[8] "gallop[]" or run quickly down Dunreath Street, turn into the park, then run through the park and turn left onto Copeland Street. As the man ran, he held his right side, either near the hip or the mid-thigh, as if there were something in the pocket. Jackson said that the item appeared to be "weighing him down." The sisters lost sight of the man soon after he left the park and turned onto Copeland Street. While the man was running past their house, Woodson saw a light-colored vehicle drive quickly down Dunreath Street.

Nicolas Guerrero and Bryan Santiago were playing basketball with Santiago's young son in the park between Dunreath and Copeland Streets when they heard gunshots. A few seconds after the shooting stopped, Santiago saw a white vehicle with a shattered passenger's side window go past. Soon thereafter,

---

[6] Leila Jackson died before the second trial. Her testimony from the first trial was read in evidence.

[7] Jackson described the jacket as "black." Woodson said it was dark, but that it "wasn't black."

[8] Jackson described the cap as black with a white brim, while Woodson suggested it was brown.

both Guerrero and Santiago saw a man run past and then leave the park. Both described him as holding the right pocket of his shorts; Guerrero described the shorts as cargo shorts, and Santiago described them as being in between "light brown" and "dark brown." Santiago believed the man was holding something relatively heavy in that pocket.

Jerome Baker was sitting on the porch of his house on Copeland Street, across the park from Dunreath Street, when he heard gunshots, which sounded like they were coming from the other side of the park. He looked up and saw a vehicle "speed away" down Dunreath Street. He then saw a man he knew at that point only as "Mo," but whom he identified during his testimony as the defendant, run through the park. He testified that he believed the defendant had been wearing jeans, but agreed that he had little recollection of the defendant's clothing and may have thought that simply because the defendant frequently wore jeans.

Joan and Joy Andrews[9] were standing near each other on the Copeland Street side of the park, watching a young girl who was Joan's grandniece and Joy's granddaughter ride her bicycle around the playground. They heard multiple gunshots in rapid succession, coming from Dunreath Street. Both were focused on

---

[9] Because they share a last name, we refer to Joan and Joy Andrews by their first names.

protecting the child, but each saw at least one person running. Joan testified that, after she left the park and had crossed the street, she saw a man running out of the park, alone, wearing cargo shorts. She said that the pocket on the right side of his shorts was swinging as though it contained a heavy object. She only saw the man from the side so was unable to distinguish his face. He continued running on Copeland Street until he reached Langford Park, a small, dead-end street, where he turned. Although Joan knew a man "by the name of Mo," she could not identify him as the person whom she saw running. Joy testified that she saw "Mo" around the neighborhood "every day," and recognized him as the first man from the area to get a job; she identified him as the defendant in court. She recalled that, immediately after hearing gunshots, she saw several people, including Mo, running out of the park and onto Copeland Street, but did not remember what Mo had been wearing.

Brian McClain was on the porch of his house on Langford Park. He saw "Mo," whom he had known much of his life, and whom he identified in court as the defendant, walking past and spoke briefly to him. McClain was unable to remember anything about the clothes the defendant had been wearing, did not remember seeing the defendant running or clutching a leg or pocket, and did not remember the defendant sweating or breathing heavily as though he had been running. McClain saw "Mo" walk down the

street toward a hole in the fence that separated the dead-end Langford Park from the properties on Perrin Street. McClain did not see him go through the hole in the fence.

ii. Interviews of Platt. Investigating officers interviewed Platt several times in order to obtain a description of the shooter. At each interview, she gave generally consistent accounts that varied somewhat in their detail. When police first spoke to Platt at the gasoline station, she was "very upset," crying, and unable to stand still. She described the shooter as a younger black male, wearing a white T-shirt and khaki pants.[10] The interview ended after only a few minutes, when the responding officer realized that Platt also had been shot, in the hip, and she was transported to the hospital. At 4:08 P.M., the officer broadcast Platt's initial description over the police radio. An audio recording of this broadcast was played for the jury.

Detective Donald Lee, who had gone directly to the hospital, spoke with Platt three times later that afternoon. During the first interview, conducted while Platt awaited

_____

[10] A police officer interviewed a man who was nearby and whose description matched that of the shooter. He was an African-American male wearing a white T-shirt, khaki shorts, and a black and gray Boston Bruins cap. During a brief conversation, the man asked calmly, "Is he dead?" Police completed a field interrogation and observation report, but there is no indication that they pursued any further investigation of this man.

treatment, she described a young black male, wearing a white T-shirt and khaki pants.  After another officer joined them, Lee and that officer conducted another, recorded, interview.  During that interview, Platt described the man as a black male wearing a white shirt, khaki shorts, a hat, and Chuck Taylor sneakers. Lee broadcast this description over the police radio at 5:07 P.M.  This broadcast, too, was played for the jury.

Lee returned to the hospital later that afternoon and obtained a second recorded statement, also played for the jury, in which Platt specified that the man had been wearing "solid black" Chuck Taylor sneakers, a black hat "with a red brim," and, after some prompting, agreed that the white shirt "might a had some red in it."

At trial, Platt testified that she saw a black male wearing "khaki cargo shorts," a shirt with a "white and red combination," a black hat with a red brim, and Chuck Taylor sneakers.

iii.  <u>Cell site location information</u>.  Cell site location information (CSLI) indicated that the defendant's cellular telephone had been near the scene of the shooting at the relevant time.[11]  State police Sergeant David Crouse testified

---

[11] The jury learned that, to make or receive calls, a cellular telephone transmits messages through radio waves to a particular cellular service provider's network of cell site towers.  Each tower (base station) serves a particular "sector"

that, on the evening prior to the shooting, the CSLI showed a cellular telephone that the defendant used routinely[12] located in a "wedge shaped" cell tower sector that included the area of the shooting. Records indicated that, the following morning, the cellular telephone was in a sector that included the defendant's house on Cardington Street. That afternoon, the CSLI showed the telephone at various locations in Roxbury other than the defendant's house.

---

(geographic region) in the provider's network. The cell towers send signals to each other, and, as an individual on an active call moves from an area served by one cell tower to another, the call will be handed off to a different cell tower. By determining which cell site received the telephone's signals at any given time, it is possible to determine, within certain limitations, the approximate location of the telephone. Because a cell tower's signal extends from two to ten miles, a given cellular telephone call may be within range of multiple cell sites at any given time.

State police Sergeant David Crouse testified that, at the beginning of a call, a cellular telephone will connect to the cell site which provides the strongest signal, typically, albeit not always, the nearest one. Because the telephone may, thereafter, be routed to a number of different cell sites within range, he prepared his testimony on the basis of the cell sites to which the telephone at issue initially connected. Both the sergeant and the records custodian acknowledged that locations derived from CSLI are not exact.

See, e.g., Commonwealth v. Gonzalez, 475 Mass. 396, 400 n.12 (2016); Commonwealth v. Augustine, 467 Mass. 230, 236-239 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).

[12] Although the defendant's mother was the listed subscriber in the telephone company's records, the defendant told detectives that the telephone number was his.

The shooting occurred at approximately 4:03 P.M. on April 17, 2012.  According to Crouse, the CSLI showed that, at 3:58 P.M., a call was made from the defendant's cellular telephone while it was located in a sector that included the scene of the shooting, and at 3:59 P.M., a call was made while the telephone was located in an adjacent sector.  Those two sectors overlapped in a relatively small area covering the location of the shooting.  Crouse testified that, to have moved from one sector to the other within such a short period of time, the person using the cellular telephone was probably "really close to where those two sectors meet."  The telephone was not used again, for incoming or outgoing calls, until 4:09 P.M., at which point the CSLI showed it as being located in the vicinity of the shooting.  At 4:14 P.M., a call was made from a sector including the area near the defendant's house.  At 4:34 P.M., police spoke with the defendant near his house.

iv.  The defendant's encounters with police.  Boston police Officer Brian Johnson, who knew the defendant from prior interactions, had spoken to him on the evening of April 16, 2012, near the area where the shooting took place the following day.  That evening, the defendant was wearing a black hat with a red Ralph Lauren Polo brand emblem.  The following day, Johnson was called to respond to a shooting.  When he learned that it had taken place at the park on Dunreath Street,

he went to the defendant's house -- located roughly an eighteen-minute walk, and less than a five-minute drive, away from the crime scene -- in order to speak to him, as he knew the defendant regularly frequented the area around that park. Johnson received an initial description of the suspect, i.e., a black male with a white T-shirt and khaki pants. Around 4:34 P.M., while en route to the defendant's house, Johnson saw the defendant walking on Cobden Street, approximately one block from his house. He was wearing a white T-shirt with a large gray and red design on the front, the same black Polo cap with a red emblem that he had worn the previous night, khaki cargo shorts, black sneakers with a red stripe near the sole, and short white athletic socks. Johnson performed a patfrisk of the defendant and found no weapons.

The defendant told Johnson that he was on his way to a nearby pharmacy to meet his mother. After the defendant left, police went to the defendant's mother's house and spoke briefly with her. She said that, although she had spoken to the defendant earlier in the day, she had no plans to meet him.

After police received Lee's broadcast from the hospital, containing Platt's somewhat more detailed description of the suspect, and noted that it remained generally consistent with that of the defendant, Johnson and his partner were asked to speak with the defendant again. They again found him on Cobden

Street, near his house. One of the officers asked the defendant if he would speak with them for a few minutes, and he agreed to do so. At that point, the defendant's demeanor was "very casual." Soon thereafter, two detectives who had been at the hospital joined them. At some point, an officer took photographs of the defendant,[13] and of a friend who was with him. When the detectives began the interview, the defendant was polite but was "showing some signs of anxiety." He reiterated that he had been at his house all day, and that he had not been near the park on Dunreath Street.

The detectives made a series of requests of the defendant. The defendant agreed to be photographed, and to give the detectives his and his mother's cellular telephone numbers. He also agreed to have his hands tested for gunshot residue,[14] but declined to go to the hospital to be viewed by Platt.[15] The defendant told the officers that he was left-handed, but subsequently he was seen signing a document with his right hand.

---

[13] Several of these photographs of the defendant were introduced at trial.

[14] One of the police officers testified that when a gun is fired, "gases, smoke and remnants of gunshot" are discharged. This can leave residue on the hands of the individual who fired it.

[15] The officers testified that they in fact had not intended to perform gunshot residue testing or to bring the defendant to the hospital, but made both requests to gauge the defendant's reaction.

After some discussion, the defendant asked if he was free to leave and, when told that he was, walked away.

v. _Forensic evidence_. Sergeant Detective Paul McLaughlin and other members of the Boston police department's homicide unit arranged for Platt's vehicle to be towed to Boston police headquarters. It had bullet holes through the hood and the windshield, a bullet lodged in the hood, and two bullets in the passenger seat.[16] In addition, police recovered shell casings from Dunreath Street. The shell casings, the bullets recovered from the vehicle, and the bullets removed from Alston's body all came from the same semiautomatic .45 caliber firearm.

2. _Discussion_. a. _Sufficiency of the evidence_. As stated, the primary issue at trial was the identity of the shooter. The defendant contends that the evidence at trial was insufficient as a matter of law to support his conviction of murder in the first degree, and therefore that his motion for a required finding should have been allowed.[17] We consider this claim to determine whether, viewing the evidence in the light most favorable to the Commonwealth, any rational finder of fact

---

[16] The vehicle was tested for fingerprints. Although some were recovered, there was "nothing that led . . . anywhere in the investigation."

[17] The defendant moved for a required finding of not guilty at the close of the Commonwealth's case and at the close of all the evidence. The judge denied the motions. She later denied the defendant's motion for postconviction relief, seeking to set aside the verdict.

could have found each of the elements of the offense beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth.  See, e.g., Commonwealth v. Lydon, 413 Mass. 309, 312 (1992).  A conviction may not, however, be based on conjecture or on inference piled upon inference.  See, e.g., Commonwealth v. Mazza, 399 Mass. 395, 399 (1987).

The Commonwealth primarily relied on three types of evidence to establish that the defendant was the shooter.  First, the Commonwealth introduced evidence of the flight path of the single person seen at the scene of the shooting who generally matched the description of the defendant.  In light of witness testimony that this man ran alone, from near the victim's vehicle down Dunreath Street and into the park, clutching something in his pocket consistent with a firearm, the jury reasonably could infer that he was the shooter.  Although witnesses gave somewhat varying descriptions, all (save two who could not identify his race) described him as black or dark-skinned, and most agreed he was wearing cargo shorts.  Those who saw him from behind were confident that he was wearing a white or primarily white T-shirt, while those who saw him from the front provided a more varied description of his clothing.

Multiple witnesses described him as wearing a black cap and sneakers; Platt provided a more specific description of each, identifying a black cap with some red and the sneakers as black Chuck Taylor ones.

The unidentified runner was linked with the defendant in several ways. First, he was seen turning onto Langford Park as he fled; the defendant's friend McClain testified that he saw the defendant on Langford Park that afternoon. Second, shortly after the shooting, police encountered and photographed the defendant wearing clothes consistent with the descriptions given by eyewitnesses: a black and red hat, a white shirt with a dark design on the front, khaki cargo shorts, and black sneakers -- albeit not the distinctive Chuck Taylor brand. Also, several witnesses, some of whom had known the defendant since childhood, testified to the defendant's knowledge of the scene. The jury could have found that the defendant grew up in the area and spent time there multiple times per week. More particularly, through the CSLI information concerning the location of the defendant's cellular telephone, and the identifications by several witnesses who had lengthy acquaintances with the defendant, the jury could have found that the defendant was present at or near the park on Dunreath Street at the time of the shooting.

In addition, the Commonwealth introduced evidence of the defendant's consciousness of guilt. Such evidence is probative and can, in conjunction with other evidence, support a verdict of guilt. See Commonwealth v. Doucette, 408 Mass. 454, 461 (1990). The Commonwealth presented evidence that the defendant lied to police, both about his whereabouts on the day of the shooting, claiming that he had been home all day despite evidence linking him to the neighborhood of the shooting, and also about his dominant hand. The jury also heard evidence that, although the defendant previously regularly had spent time in the area of the shooting, after the shooting, he avoided the area; when asked why he had not been around, he explained that there was a heavy police presence.

Although these discrete pieces of evidence, standing alone, might not be sufficient to sustain a conviction, together they formed a "mosaic" of evidence such that the jury could conclude, beyond a reasonable doubt, that the defendant was the shooter. Commonwealth v. Salim, 399 Mass. 227, 233 (1987). Cf. Lydon, 413 Mass. at 312-313 (upholding conviction based on defendant's regular presence at location of shooting, his capture in vehicle generally consistent with one identified at scene, his consciousness of guilt, his prior threats to victim, and recovery of weapon used in killing on road traveled by defendant). While not overwhelming, the evidence would have

permitted the jury to infer guilt from the combination of the defendant's presence in the area of the shooting, his consciousness of guilt, and the similarity between his clothing and the clothing worn by the sole person seen fleeing the scene.[18]  There was no error, therefore, in the judge's denial of the defendant's motion for a required finding.[19]

---

[18] The defendant's effort to analogize the circumstances here to cases such as Commonwealth v. Mazza, 399 Mass. 395, 399-400 (1987), is unavailing.  In that case, we determined that the defendant's mere presence at the scene of the crime, at a time that could not be connected to the victim's death, coupled with evidence of consciousness of guilt, was insufficient to sustain a conviction.  See id.  Here, by contrast, there was evidence that the defendant was present at the scene at the time of the shooting and that his physical description matched, at least to some degree, a number of witnesses' descriptions of the sole person leaving the scene.

[19] Although the defendant does not contend that the evidence was insufficient to prove beyond a reasonable doubt the remaining elements of murder in the first degree by deliberate premeditation or extreme atrocity or cruelty, we nevertheless have reviewed the record pursuant to our duty under G. L. c. 278, § 33E, and conclude that the evidence was sufficient to sustain a conviction on both theories.

To prove murder in the first degree on a theory of deliberate premeditation, the Commonwealth must show beyond a reasonable doubt that the defendant intentionally caused the victim's death and that he or she did so with deliberate premeditation.  That the shooter carried a loaded gun to the scene and shot an unarmed victim five times was sufficient to make this showing.  See Commonwealth v. Andrews, 427 Mass. 434, 440-441 (1998).

To prove murder in the first degree on a theory of extreme atrocity or cruelty, the Commonwealth must show beyond a reasonable doubt that the defendant caused the victim's death with the intent to kill, with the intent to cause grievous bodily harm, or with the intent to do an act that the defendant

b. <u>Peremptory challenge of a prospective juror</u>. The defendant contends that the judge abused her discretion by declining to require the prosecutor to provide an adequate and genuine race-neutral reason for her peremptory challenge to an African-American member of the venire. See <u>Commonwealth</u> v. <u>Oberle</u>, 476 Mass 539, 545 (2017).

The Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights prohibit a party from exercising a peremptory challenge on the basis of race.[20] See <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79, 95 (1986); <u>Commonwealth</u> v. <u>Soares</u>, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979). While the inquiries under the Federal and State Constitutions each have a different focus, they lead to the same conclusion. See <u>Commonwealth</u> v. <u>Benoit</u>, 452 Mass. 212,

_____

should have known was likely to cause death. It must further prove beyond a reasonable doubt that the defendant acted with extreme atrocity or cruelty. The evidence was sufficient to show intent to kill and at least two of the seven <u>Cunneen</u> factors sufficient to establish extreme atrocity or cruelty. See <u>Commonwealth</u> v. <u>Cunneen</u>, 389 Mass. 216, 227 (1983). That the victim remained conscious long enough to put the vehicle in gear showed his consciousness of suffering, see <u>Commonwealth</u> v. <u>Brown</u>, 474 Mass. 576, 579 (2016), and expert testimony that three of the five gunshots each independently might have been enough to kill the victim established a disproportion between the means necessary to cause death and those employed. See <u>Commonwealth</u> v. <u>James</u>, 427 Mass. 312, 313-314 (1998).

[20] A peremptory challenge on the basis of membership in other constitutionally protected groups, such as sex, also is prohibited. See <u>J.E.B.</u> v. <u>Alabama ex rel. T.B.</u>, 511 U.S. 127, 130 (1994); <u>Commonwealth</u> v. <u>Soares</u>, 377 Mass. 461, 488-489, cert. denied, 444 U.S. 881 (1979).

218 n.6 (2008). The Federal inquiry turns on the right of the prospective juror to be free from discrimination in the exercise of his or her right "to participate in the administration of the law." Id., quoting Strauder v. West Virginia, 100 U.S. 303, 308 (1880). The question under our Declaration of Rights, on the other hand, focuses on the defendant's right to be tried by a fairly drawn jury of his or her peers. See Benoit, supra; Soares, supra at 488. "Regardless of the perspective from which the problem is viewed, [however,] the result appears to be the same." Benoit, supra. A party may no more seek to strike a single prospective juror on the basis of his or her race than attempt to strike all members of a particular race. See Snyder v. Louisiana, 552 U.S. 472, 478 (2008); Commonwealth v. Lacoy, 90 Mass. App. Ct. 427, 431 (2016).

A challenge to a peremptory strike, whether framed under State or Federal law, is evaluated using a burden-shifting analysis. In the initial stage, the burden is on the party challenging the peremptory strike to make a prima facie showing that the strike is improper. If the party does so, the burden shifts to the party attempting to strike the prospective juror to provide a group-neutral reason for doing so. The judge then must determine whether the proffered reason is adequate and genuine. See, e.g., Benoit, 452 Mass. at 218-220. An appellate court reviews the trial judge's decision to allow the juror to

be struck for abuse of discretion. See, e.g., Commonwealth v. Issa, 466 Mass. 1, 10 (2013). The question in this case is whether, as to the first part of this three-part inquiry, the judge abused her discretion in declining to find that the defendant had made a prima facie showing of impropriety in the prosecutor's peremptory challenge of prospective juror no. 143.

The defendant first lodged an objection to the prosecutor's use of the peremptory challenge after the Commonwealth had challenged juror no. 113B, an African-American.[21] At that point, no African-Americans had been seated, and the prosecutor had used peremptory challenges to exclude four prospective jurors who were African-American, and seven prospective jurors of other races. The judge determined that the defendant had made a prima facie showing of improper use of the peremptory challenge, and required the prosecutor to provide an adequate and genuine race-neutral reason for her decision to strike. The prosecutor provided such an explanation, pointing out that the prospective juror, whose native language was not English, seemed to have some difficulties with his comprehension of English. The judge deemed the explanation satisfactory, and also noted additional concerns the juror had raised about his young child, who was

---

[21] Two members of the venire were identified in the record as "Juror number 113." Following the lead of the parties, we refer to the challenged juror, who was the second of the two to be called to voir dire, as "juror no. 113B."

facing surgery.  The defendant does not contest this determination on appeal.

The defendant again challenged the prosecutor's use of peremptory strikes after she attempted to strike juror no. 143, also an African-American.  Between the dismissal of juror no. 113B and the voir dire of juror no. 143, one African-American juror and one juror of another race had been seated without challenge by either party,[22] and, in addition to juror no. 143, the prosecutor had struck one juror who was not African-American.  Thus, at that point, the Commonwealth had used peremptory challenges against five prospective jurors who were African-American and eight other prospective jurors, while one African-American and six jurors of other races had been empanelled.  The defendant had exercised eight peremptory strikes that were not challenged; the record is silent as to the race of any of those jurors.

In considering the defendant's challenge to the prosecutor's exercise of a peremptory challenge to strike juror no. 143, the judge, persuaded by the presence of a single African-American on the empanelled jury, determined that the defendant had not met his prima facie burden.  After some initial confusion regarding the racial composition of the seated

_____

[22] The African-American who had been empanelled was juror no. 117.  This juror was the next to be called to voir dire following the defendant's first Batson-Soares challenge.

jurors, the judge declined to require the prosecutor to offer an adequate and genuine race-neutral reason for the strike. The judge commented:

> "I think we're still in the same position as we were the last time relative to the prima facie showing of irregularity. There are no -- strike that. I just noticed there is an African-American woman on the jury. I forgot about her, the woman who works as a member of the Board of Bar Overseers. That being the case, . . . I cannot find that you have made a prima facie showing, because I'm entitled to look at the composition of the jury. And of the seven [empanelled] jurors there is an African-American woman on this jury."

It is this decision which the defendant maintains was an abuse of discretion; we agree. Peremptory challenges are presumed to be proper, but rebutting the presumption of propriety is not an onerous task. By their nature, peremptory challenges "permit[] 'those to discriminate who are of a mind to discriminate'" (citation omitted). Batson, 476 U.S. at 96. In light of this, and in order "to ensure that the important protections set forth in [Batson and Soares] are fully adhered to, the burden of making [the prima facie] showing ought not be a terribly weighty one." Commonwealth v. Maldonado, 439 Mass. 460, 463 n.4 (2003).

The United States Court of Appeals for the First Circuit has called the first stage burden "not substantial." Sanchez v. Roden, 753 F.3d 279, 302 (1st Cir. 2014), quoting Aspen v. Bissonnette, 480 F.3d 571, 574 (1st. Cir.), cert. denied, 552

U.S. 934 (2007), appropriately characterizing it as being merely a burden of production, not persuasion. See Sanchez, supra at 306. See also Johnson v. California, 545 U.S. 162, 168 (2005) (rejecting requirement that discrimination be "more likely than not" in order to make prima facie showing); Aspen, supra at 575 (rejecting requirement that discrimination be "likely"). Given the relative ease with which a party can make the necessary prima facie showing, we have urged "judges to think long and hard before they decide to require no explanation . . . for [a] challenge." Issa, 466 Mass. at 11 n.14.[23]

When evaluating whether the party challenging the strike has met the relatively low bar of a prima facie showing, a trial judge is to consider all of the relevant facts and circumstances. See Batson, 476 U.S. at 96; Sanchez, 753 F.3d at 299-300. The inquiry ordinarily begins with the number and percentage of group members who have been excluded. See Issa, 466 Mass. at 9. This factor can, in certain circumstances, itself suffice to make the requisite prima facie showing. See

---

[23] Some jurisdictions have eliminated the need to make a prima facie showing, and require a race-neutral reason whenever a Batson challenge is made. See Commonwealth v. Maldonado, 439 Mass. 460, 463 n.4 (2003), citing State v. Holloway, 209 Conn. 636, 645-646, cert. denied, 490 U.S. 1071 (1989), State v. Johans, 613 So. 2d 1319, 1321 (Fla. 1993), State v. Parker, 836 S.W.2d 930, 939 (Mo.), cert. denied, 506 U.S. 1014 (1992), and State v. Chapman, 317 S.C. 302, 305-306 (1995), overruled on other grounds, State v. Adams, 322 S.C. 114 (1996).

id.  Other factors to consider may include:[24]  the possibility of an objective group-neutral explanation for the strike or strikes;[25] any similarities between excluded jurors and those, not members of the allegedly targeted group, who have been struck; differences among the various members of the allegedly targeted group who were struck;[26] whether those excluded are members of the same protected group as the defendant or the victim;[27] and the composition of the jurors already seated.  See Miller-El v. Dretke, 545 U.S. 231, 241 (2005); Issa, 466 Mass. at 10-11; Sanchez, 753 F.3d at 302; State v. Rhone, 168 Wash. 2d 645, 656, cert. denied, 562 U.S. 1011 (2010).

---

[24] This list of factors is neither mandatory nor exhaustive; a trial judge and a reviewing court must consider "all relevant circumstances" for each challenged strike.  See Batson v. Kentucky, 476 U.S. 79, 96 (1986).  See also People v. Rivera, 221 Ill. 2d 481, 501 (2006) (citing seven such factors); State v. Rhone, 168 Wash. 2d 645, 656, cert. denied, 562 U.S. 1011 (2010) (listing eight factors and noting they are "not exclusive").

[25] This factor overlaps with the analysis at the second and third stages, in which the proponent of the strike must provide an adequate and genuine group-neutral reason to justify it; such considerations may play a role in the first-step analysis as well.

[26] Because the record does not reveal which of the prospective jurors struck by the Commonwealth, other than jurors nos. 113B and 143, were African-American, we cannot evaluate this factor.

[27] This factor does little to tip the balance in either direction here.  The defendant and both of the alleged victims were members of the same protected group as the excluded juror. See Commonwealth v. Issa, 466 Mass. 1, 11 (2013).

In many respects, this case is similar to Sanchez, in which the First Circuit concluded that the judge abused his discretion in failing to find that the defendant had made a prima facie showing of impropriety in a peremptory strike.  See Sanchez, 753 F.3d at 299.  We look to many of the same factors as the Sanchez court did, and turn first to the numerical considerations:  the raw number of African-American prospective jurors struck up to that point, and the percentage of such jurors struck.

The raw number of African-American prospective jurors struck, standing by itself, is inconclusive here.  The prosecutor excluded five African-American members of the venire, a number comparable to the four persons of color whose exclusion was challenged in Sanchez, supra at 303.  Cf. Issa, 466 Mass. at 10 (judge could have found, but was not required to find, prima facie showing where prosecutor excluded one African-American prospective juror, who was last such juror in venire).

On the other hand, the percentage of African-American prospective jurors struck suggests that the defendant made the necessary prima facie showing.[28]  At the time when the defendant raised his second Batson-Soares objection, to the peremptory strike of juror no. 143, the prosecutor had struck five African-American prospective jurors and one such juror had been

---

[28] As was the case in Sanchez, 753 F.3d at 307, the record is not entirely clear.

empanelled. For comparison, the prosecutor had struck eight prospective jurors of other races, but six jurors of other races had been empanelled. Because the record does not disclose whether one or more African-Americans had not been challenged by the Commonwealth, but subsequently had been struck by the defendant, we cannot say with certainty, as the defendant would have us do, that the prosecutor struck five of six -- or more than eighty-three per cent -- of African-Americans whom the judge declared indifferent. Nevertheless, it seems that the prosecutor exercised a disproportionate number of her peremptory challenges against African-Americans, challenging a much higher percentage of African-American members of the venire than of prospective jurors of other races. See Commonwealth v. Hamilton, 411 Mass. 313, 316-317 (1991) (concluding prima facie showing had been made solely on basis that prosecutor challenged sixty-seven per cent of African-American members of venire compared to fourteen per cent of Caucasian members of venire). Contrast Issa, 466 Mass. at 10 (no indication of disproportionate use of peremptory strikes).

Moving beyond purely numerical considerations, the possibility that juror no. 143 was struck because of her race is heightened by the fact that the record reveals no race-neutral reason that might have justified the strike. See Sanchez, 753 F.3d at 303 ("Juror . . . answered all . . . questions

appropriately, and nothing . . . casts doubts on his ability to . . . follow . . . instructions or evaluate the evidence fairly and impartially").  Like all of the jurors who had been seated, juror no. 143 gave brief, straightforward, and appropriate answers to the voir dire questions, and no issues of bias or competence were raised.  Contrast Issa, 466 Mass. at 11, where our determination that the judge did not abuse his discretion in failing to find a prima facie showing of discrimination took into account the prosecutor's possible recognition of the prospective juror whom she struck.  Here, on the other hand, we discern no objective reason that juror no. 143 could not have served.

The significant similarities between juror no. 143 and other prospective jurors to whom the prosecutor did not object further strengthen the possibility that juror no. 143 was struck because of her race.  See, e.g., Sanchez, 753 F.3d at 302 (focus on "whether similarly situated jurors [of other races] were permitted to serve" [citation omitted]).  The prosecutor only briefly questioned juror no. 143 before exercising the peremptory strike, and the questions she asked her had not been asked of most of the previous prospective jurors, so any detailed comparison is difficult.  Compare id. at 304 (record permitted detailed comparison with one particular juror who was not African-American).  It is, nonetheless, telling that the

prosecutor did not strike prospective jurors with characteristics similar to those of juror no. 143, who either were not African-American or whose race is not evident from the record.

In response to questioning from the prosecutor, juror no. 143 revealed that she worked by herself rather than with others, that that she or a member of her family previously had served on a jury, and that she had attended high school outside the United States. With the exception of her education outside the United States, elicited in response to a question asked of too few jurors to allow for comparison, her responses did not differentiate her from other prospective jurors. At least two other prospective jurors, including a non-African-American juror who was seated, had previous experience with jury service, while others, again including a non-African-American who was seated, did not work with others.[29]

In concluding that the defendant had not met his minimal prima facie burden, the judge appears to have relied primarily, if not exclusively, on the presence of the single African-American who at that point had been seated. That juror, juror no. 117, was seated immediately following the defendant's first Batson-Soares challenge to juror no. 113B, where the judge

---

[29] In addition, the prosecutor struck several jurors who reported that they did work with others.

without hesitation had determined that the defendant had made a prima facie showing of discrimination.[30]

While it is permissible for a judge to consider the composition of the empanelled members of the jury, insofar as it may affect whether he or she infers discrimination in the strike under review, see Commonwealth v. Scott, 463 Mass. 561, 571 (2012); Scott v. Gelb, 810 F.3d 94, 103 (1st Cir. 2016) (denying habeas corpus in same case), that is only one factor among many, and must be assessed in context. The presence of one empanelled African-American juror, as appears to have been the case here, cannot be dispositive. Indeed, in Sanchez, five African-Americans already had been seated. See Sanchez, 753 F.3d at 303. As the court explained in that case, to place undue weight on this factor not only would run counter to the mandate to consider all relevant circumstances, see Batson, 476 U.S. at 96-97, but also would send the "unmistakable message that a prosecutor can get away with discriminating against some African Americans . . . so long as a prosecutor does not discriminate

_____

[30] While a judge must evaluate each such challenge on the facts known at the time, we note that little had changed since the judge had found a prima facie showing of discrimination. Between the two challenges, the prosecutor had exercised two peremptory strikes, one against juror no. 143, an African-American, and one against a juror who was not African-American. The proportion of the Commonwealth's strikes exercised against African-Americans, therefore, actually had increased slightly, from four out of eleven to five out of thirteen.

against all such individuals" (emphasis in original).  See Sanchez, supra at 299.

Consideration of all relevant circumstances compels the conclusion that the defendant made the limited showing necessary to make out a prima facie showing of discrimination, and that the judge abused her discretion by finding otherwise.  Had the judge allowed the inquiry to go forward, the prosecutor might well have proffered an adequate and genuine race-neutral reason for her strike of juror no. 143.  Because the judge did not do so, and because a Batson-Soares error constitutes structural error for which prejudice is presumed,[31] we vacate the convictions and remand the case to the Superior Court for a new trial.[32]

---

[31] In this case, we reach only the first step of the Batson-Soares analysis, and acknowledge the constitutionally permissible option of remanding for an evidentiary hearing at which the Commonwealth would bear the burden of establishing a race-neutral justification for the challenge which would render the judge's error harmless.  See, e.g., Sanchez v. Roden, 753 F.3d 279, 307 (1st Cir. 2014).  We have long disfavored this approach, however, on the ground that "the conditions of the empanelment . . . cannot be easily recreated."  Soares, 377 Mass. at 492 n.37.  See Issa, 466 Mass. at 11 n.14 (error in failing to find prima facie showing of discrimination "unlikely to be harmless").

[32] We discern no merit in the Commonwealth's argument that the defendant waived the Batson-Soares issue either by failing to object a second time following the judge's determination that he had not made the necessary prima facie showing, or by mentioning only Soares, 377 Mass. 461, rather than both Soares and Batson, 476 U.S. 79.

c. <u>Issues on retrial</u>. We discuss briefly those issues which may occur at a new trial.[33]

i. <u>Refusal evidence</u>. On cross-examination of Johnson, one of the investigating officers who spoke with the defendant, defense counsel elicited testimony that the defendant willingly spoke to police, that he was polite, and that he consented to have his hands swabbed for gunshot residue. On redirect examination of Johnson, and again on direct examination of Sergeant Thomas O'Leary, the Commonwealth then elicited testimony that the defendant refused to go to the hospital to be viewed by Platt, the surviving victim.

To be sure, absent a defendant "opening the door" to such testimony, admission of "refusal" evidence violates a defendant's right against self-incrimination. See art. 12 of the Massachusetts Declaration of Rights; <u>Commonwealth</u> v. <u>Conkey</u>, 430 Mass. 139, 141-142 (1999), <u>S.C.</u>, 443 Mass. 60 (2004).[34] To

---

[33] We do not reach the defendant's claim that the judge improperly limited his cross-examination of Detective Donald Lee, noting only that the trial judge has discretion to determine the proper scope of cross-examination. See <u>Commonwealth</u> v. <u>Johnson</u>, 431 Mass. 535, 540 (2000). Nor do we address the defendant's claim that his trial counsel rendered ineffective assistance.

[34] For example, while a defendant's compelled production of a writing exemplar does not violate his or her privilege against self-incrimination, the Commonwealth ordinarily may not introduce evidence of a defendant's refusal to participate voluntarily in such a procedure; the latter, unlike the former, is testimonial evidence protected under art. 12 of the

the extent that the defendant leaves the jury with a false or misleading impression, however, he thereby opens the door to the Commonwealth's introduction of pertinent refusal evidence on that issue to correct the misimpression created. See Commonwealth v. Beaulieu, 79 Mass. App. Ct. 100, 104 (2001) (where defense counsel elicited testimony that defendant was not subjected to field sobriety test, Commonwealth was entitled to elicit testimony that defendant refused); Commonwealth v. Johnson, 46 Mass. App. Ct. 398, 405-406 (1999) (where defendant testified that he "did not disguise his voice" during identification procedure, Commonwealth was entitled to elicit testimony that defendant twice failed to show up for voice identification). Cf. Commonwealth v. Toolan, 460 Mass. 452, 471 (2011) (where defendant puts voluntariness of statement at issue, prosecutor may introduce post-Miranda silence to show voluntariness). To the extent that defense counsel elicited on cross-examination of Johnson that the defendant had been willing to be swabbed for gunshot residue, was willing to turn over his

_____

Massachusetts Declaration of Rights. See Opinion of the Justices, 412 Mass. 1201, 1209 (1992) (discussing difference between testimonial and real evidence). While this distinction is well established as a matter of Massachusetts law, the United States Supreme Court has reached the opposite conclusion under the cognate provision of the Federal Constitution, see South Dakota v. Neville, 459 U.S. 553, 564 (1983) (refusal to take breathalyzer admissible under Fifth Amendment to United States Constitution), as have many other States under the cognate provisions of their State Constitutions.

and his mother's telephone numbers, and was otherwise generally cooperative, the door was surely open to refusal evidence as to the topics he raised. The question here is how widely the door was opened. Otherwise put, the question is whether the defendant, by eliciting evidence to show he cooperated in certain respects, thereby allowed the Commonwealth to elicit refusal evidence showing he did not cooperate in a different respect.

In decisions to date, the admitted refusal evidence has been confined to the discrete issue with regard to which the defendant elicited evidence. See Beaulieu, 79 Mass. App. Ct. at 104; Johnson, 46 Mass. App. Ct. at 405-406. In addition to assuring that the risk of undue prejudice from the proffered testimony does not outweigh its probative value, see Commonwealth v. Crayton, 470 Mass. 228, 249 & n.27 (2014), it is the better part of wisdom, in such circumstances, given the constitutional protection accorded to testimonial refusal evidence, to view the door as having been left ajar rather than wide open. Had the defendant only elicited testimony that he had consented to gunshot residue testing, refusal evidence, if any, limited to that discrete issue, would be proper. That being said, to the extent that the defendant here elicited considerable evidence creating the impression of full cooperation with the police, evidence as to his refusal to

cooperate by allowing Platt to see him at the hospital was probative of that issue. Given this, it was not an abuse of discretion to allow the Commonwealth to inquire on redirect examination of Johnson as to the challenged refusal evidence. Because such evidence should be admitted charily, however, it should not have been allowed to come in a second time on the direct examination of O'Leary.[35]

    ii. _Police radio broadcast_. At trial, the Commonwealth played a police radio broadcast in which Lee, one of the detectives who interviewed Platt at the hospital, thereafter relayed the description of the suspect that Platt had given him: "a young male with khaki shorts, Chuck Taylor sneakers, a white and red shirt, and a black and red baseball cap." The defendant maintains that this broadcast was hearsay and should not have been admitted. The Commonwealth contends that it was admissible for two reasons: to show the state of police knowledge, and as an earlier out-of-court identification of the defendant by a testifying witness. Neither is persuasive.

---

[35] The Commonwealth also contends that the admission of refusal evidence was proper to rebut a defense of insufficient police investigation. See generally Commonwealth v. Bowden, 379 Mass. 472 (1980). Insofar as police, by their own admission, did not intend to have the defendant viewed by the surviving victim even if he had consented, this argument fails. Contrast Commonwealth v. Beaulieu, 79 Mass. App. Ct. 100, 103-105 (2001) (police intended to perform field sobriety testing if defendant consented).

As to the first reason, the Commonwealth argues that the radio broadcast showed the state of police knowledge and thereby provided the jury with context for the detectives' decision to speak repeatedly to the defendant after the shooting. See Commonwealth v. Miller, 361 Mass. 644, 659 (1972). Hearsay admitted for this purpose, however, rarely should give such a specific description; instead, "a statement that an officer acted 'upon information received,' . . . or words to that effect" is sufficient. See Commonwealth v. Rosario, 430 Mass. 505, 510 (1999), quoting McCormick, Evidence § 249 (E. Cleary 3d ed. 1984). Even in that event, such evidence would require a limiting instruction, not given here, that it cannot be used for the truth of the description it contains.

In reliance on Mass. G. Evid. § 801(d)(1)(C) (2017), and cases cited, the Commonwealth also maintains that the radio broadcast is admissible for its truth insofar as Platt testified at trial and the broadcast "identifies the person as someone the declarant [Platt] perceived earlier." Quite apart from the failure to overcome the totem pole hearsay aspect of the challenged broadcast, Platt did not see the shooter, nor could she identify the defendant as the shooter. While in certain instances a description of a person's characteristics, rather than an identification of a specific person, can constitute an identification for purposes of the aforesaid rule, see, e.g.,

Commonwealth v. Weichell, 390 Mass. 62, 72 (1983), cert. denied, 465 U.S. 1032 (1984) (approving admission of detailed facial description of perpetrator), the description here was simply too vague to qualify.

iii. Instruction on circumstantial evidence. The judge informed the venire, before empanelment, that the case likely would turn on circumstantial evidence, and that such evidence, like direct evidence, was sufficient to prove guilt beyond a reasonable doubt. This was a correct statement of the law, and often is given during a judge's charge. See Commonwealth v. Colon-Cruz, 408 Mass. 533, 556 (1990). See also Massachusetts Superior Court Criminal Practice Jury Instructions § 1.3 (Mass. Cont. Legal Educ. 2d ed. 2013). To the extent that the defendant contends that such an instruction, while appropriate after the close of all the evidence, is inappropriate to give to the venire before trial, we disagree. In Commonwealth v. Andrade, 468 Mass. 543, 548-549 (2014), for example, we held that a judge does not abuse his or her discretion by taking the stronger step of asking prospective jurors individually whether they would be able to convict on the basis of circumstantial evidence, and striking for cause those who answer in the negative.

iv. Instruction on mere presence. The defendant contends that he is entitled to an instruction that his mere presence at

the scene of the shooting is not sufficient to convict. While such an instruction is permissible, we decline to require it, insofar as the standard instructions regarding the elements of the offenses adequately cover the issue. See Commonwealth v. Hoose, 467 Mass. 395, 412 (2014) (no specific instruction necessary where Commonwealth's burden of proof adequately explained by standard instruction). The judge correctly instructed the jury that, in order to convict the defendant of murder in the first degree, they must find that the defendant "caused the death" of the victim and that he "consciously and purposefully intended to cause" the victim's death.[36] A reasonable jury could not find these elements beyond a reasonable doubt based on the defendant's mere presence in a public park.

3. Conclusion. The defendant's convictions are vacated and set aside. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[36] Similarly explicit instructions were given regarding the elements of the other crimes with which the defendant was charged.